[No. D020491. Fourth Dist., Div. One. Jan. 12, 1995.]

McMILLIN-BCED/MIRAMAR RANCH NORTH, Plaintiff and Appellant,
v.
COUNTY OF SAN DIEGO, Defendant and Respondent.

## COUNSEL

Weil & Wright and Archie T. Wright III for Plaintiff and Appellant.

Lloyd M. Harmon, Jr., County Counsel, Diane Bardsley, Chief Deputy County Counsel, and Andrew J. Freeman, Deputy County Counsel, for Defendant and Respondent.

## OPINION

**HUFFMAN, J.**—Plaintiff McMillin-BCED/Miramar Ranch North (McMillin-BCED), a California general partnership, appeals the judgment of the superior court in favor of the County of San Diego (the County), defendant and respondent, in McMillin-BCED's action for refund of property taxes.

(Rev. & Tax. Code,[1] §§ 51, 5097, 5149.) Pursuant to California Constitution, article XIII A, section 2 (article XIII A) and section 60 et seq., the County tax assessor reassessed land owned by the partnership on the lien date of March 1, 1991, on the basis that a 100 percent change of ownership had occurred on February 12, 1990. The assessor applied the step transaction doctrine (sometimes called the doctrine) to view several discrete business and real property transfers in 1990 as one taxable transaction accomplishing a change of ownership of the subject 1,200 acres of property.

On appeal, McMillin-BCED contends the trial court erred in applying the step transaction doctrine, because there was an inadequate showing that both of the partners in the McMillin-BCED partnership had the intention throughout the various steps involved in the transactions to reach the same end result, that a different corporation would be the partial new owner of the partnership which owned the property. McMillin-BCED also contends the trial court improperly found that the close proximity in time of some of the steps in the transactions justified application of the doctrine, and improperly extended the accepted tests for the application of such doctrine as created by case law. (*Shuwa Investments Corp.* v. *County of Los Angeles* (*Shuwa*) (1991) 1 Cal.App.4th 1635, 1648-1657 [2 Cal.Rptr.2d 783].)

In response, the County argues that when the transactions are viewed as a whole, they in effect constituted a 100 percent change in ownership because there was a transfer of ownership of land from a corporation to a partnership consisting of different corporations. We agree with the County that under the step transaction doctrine, the separate transfers must be treated as a single transaction for tax purposes, and the trial court therefore was correct in concluding that a 100 percent reassessment was proper and no tax refund was due. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

The parties do not dispute the facts of the various transactions in this case, only the legal conclusions to be drawn from them. The players are as follows: BCE Development, Inc. (Development) is the parent corporation of a wholly owned subsidiary, BCE Development Properties, Inc. (Properties). Development and Properties were affiliates for tax purposes for this reason. On May 5, 1989, Properties agreed to sell the subject 1,200 acres of land for $100 million to McMillin/Scripps Ranch (Buyer), a California limited partnership, acting by its sole general partner, McMillin Communities, Inc. (McMillin), a California corporation. Properties was to have obtained title to

---

[1]All statutory references are to the Revenue and Taxation Code unless otherwise specified.

the land from Development, then the owner, before the sale went through. This agreement fell through because Buyer could not obtain the necessary financing and did not want to incur any liabilities arising from predevelopment activities on the land.

Development then decided to develop the land with the assistance of an experienced residential developer. The following transactions ensued: As of January 26, 1990, title to the land was still held by Development. On that date, Development and Properties formed (but did not fund) a general partnership called Scripps Ranch. The partnership agreement required Development to contribute 30 percent tenancy-in-common interest in the land and Properties to contribute 70 percent tenancy-in-common interest in the land to the newly formed partnership, as initial capital contributions. Profits and losses were to be shared in the same proportions. Four days later, Development conveyed a 70 percent tenancy-in-common interest in the land to Properties. For purposes of discussion, we shall refer to the tenancy-in-common transfer between Development and Properties as Step 1.[2]

On February 7, 1990, Development and Properties, as tenants-in-common, refinanced the land for $50 million. They executed a promissory note and deeds of trust in favor of their lender, Mortgage Development Corporation (MDC), which was, like Development, a wholly owned subsidiary of BCE Canada. MDC immediately assigned the note to yet another wholly owned subsidiary of BCE Canada, BCED Pacific, Inc. In a declaration prepared by Jeffrey H. Wagner, the director of taxation of the BCED corporations, submitted in support of the McMillin-BCED opening trial brief, the purpose for this loan was explained: "(a) to strengthen and improve [Development's] interest in the Land by becoming a secured lender and (b) to reduce the amount of equity in the Land a future developer/investor would be required to 'buy into.' " We shall refer to this transaction, the refinancing of the land by Development and Properties as tenants-in-common, as Step 2.

Step 3 also took place on February 7, 1990, when Development and Properties deeded their respective interests in the land to the Scripps Ranch partnership, as required by the partnership agreement. In other words, they exchanged their 30-70 percent interests in the land for general partnership interests which would own the land. This structure would provide flexibility to negotiate a particular financial deal with a developer. The Scripps Ranch partnership assumed the loan on a nonrecourse basis.

---

[2]For whatever assistance it may provide, we attach as appendix A a diagram of the transactions found in the administrative record as part of McMillin-BCED's assessment appeal application.

Development then carried out negotiations with McMillin, as well as a competing developer, Davidson Communities, Inc. (Davidson), to establish terms for a partnership agreement. On February 9, 1990, the Scripps Ranch partnership and McMillin entered into a contribution agreement establishing the terms and conditions for McMillin's admission as a partner and Development's withdrawal from the partnership. Development agreed to guarantee the performance of all of Properties' present and future obligations to McMillin under the partnership agreement. McMillin agreed to contribute $5 million cash to the partnership. Properties' capital account was valued at $30 million. Development assigned its 30 percent partnership interest to, and withdrew from, the partnership.

The effective date of the first amended and restated agreement of general partnership was February 12, 1990. Step 4 thus took place when McMillin bought into the appellant partnership. Two days later, the partnership name was changed from Scripps Ranch to McMillin-BCED. Pursuant to this agreement, McMillin now held a 14 percent interest in the capital of the partnership, a 30 percent interest in the profits, and a 50 percent management interest.

On March 1, 1991, the assessment date next occurring after these transactions took place, the county assessor reassessed the land, claiming that a 100 percent change in ownership had occurred on February 12, 1990. McMillin-BCED appealed this decision to the County Assessment Appeals Board, No. 2 (the board), which denied the application for a reduction of property taxes after an administrative hearing. McMillin-BCED then filed its complaint for refund of property taxes and a court trial was held in which opposing declarations and the administrative record were admitted into evidence. McMillin-BCED set forth its asserted business reasons for the various steps, including the use by Development of certain net operating losses of Properties for income tax purposes after the transfer of the tenancy-in-common interests.

The board's decision was upheld and judgment entered for the County. The trial court analyzed the timing and the nature of the transactions, the evidence of the desire to develop the land, and the end result in order to conclude that a 100 percent change of ownership had taken place under the step transaction doctrine. The court reasoned:

"All of the actual steps occurred within a two-week period. Each of the steps can logically be traced to Development's intention from the outset to reach the ultimate result of having an unaffiliated developer with an ownership interest in place to develop the land.

"There seems to be clear interdependence within the steps. Objectively, one can reasonably interpret the transfers to affiliates, the loan to reduce the equity to make the capital contribution of an incoming partner more reasonable, the assumption of the indebtedness and the transfer of ownership to McMillin as interdependent steps to a planned conclusion. Objectively, it seems clear the creation of the co-tenancy was to facilitate the sale to McMillin. Knowing the objective of the various transactions, it appears that Development and Properties were committed to the end result of developing the land in a partnership with an unaffiliated developer."

The court thus concluded that all three tests established for application of the step transaction doctrine, the "end result test," the "interdependence test," and the "binding commitment test" were all met, and thus a 100 percent change of ownership was found. McMillin-BCED timely appealed the judgment.

## DISCUSSION

Was there a change in ownership of the property under these facts? "Article XIII A of the California Constitution (Proposition 13) provides that real property shall be reassessed for property tax purposes when a 'change in ownership' occurs or the property is 'newly constructed' or 'purchased.' [Citations.] The Supreme Court in *Amador Valley Joint Union High School Dist.* v. *State Board of Equalization* (1978) 22 Cal.3d 208, 245 [149 Cal.Rptr. 239, 583 P.2d 1281], determined the meaning of 'change of ownership' was left for resolution 'by the contemporaneous construction of the Legislature or of the administrative agencies charged with implementing the new enactment.' [Citations.]" (*Shuwa, supra,* 1 Cal.App.4th at p. 1645.) Section 60 defines a change in ownership as "a transfer of a present interest in real property, including the beneficial use thereof, the value of which is substantially equal to the value of the fee interest."

I

*Standard of Review*

"It is well settled that the interpretation and application of a statutory scheme to an undisputed set of facts is a question of law [citation] which is subject to de novo review on appeal. [Citation.] Accordingly, we are not bound by the trial court's interpretation. [Citation.]" (*Rudd* v. *California Casualty Gen. Ins. Co.* (1990) 219 Cal.App.3d 948, 951-952 [268 Cal.Rptr. 624].) An appellate court is free to draw its own conclusions of law from the undisputed facts presented on appeal. (*Pueblos Del Rio South* v. *City of San Diego* (1989) 209 Cal.App.3d 893, 899 [257 Cal.Rptr. 578].)

In *Shuwa, supra,* 1 Cal.App.4th at page 1644, the court stated the standard of review simply: "What constitutes a 'change in ownership' is a question of law subject to this court's independent de novo judicial review. [Citation.]" ■ It occurs to us, however, that the application of the step transaction doctrine requires an analyis of the parties' purposes and intents in carrying out the various steps in the transaction. (*Id.* at pp. 1648-1657.) Such issues as intent and purpose are customarily viewed as factual issues. ■ Even though there was essentially no factual dispute in this case, we find the Supreme Court's analysis of mixed questions of law and fact to be of assistance here: "Questions of fact concern the establishment of historical or physical facts; their resolution is reviewed under the substantial-evidence test. Questions of law relate to the selection of a rule; their resolution is reviewed independently. Mixed questions of law and fact concern the application of the rule to the facts and the consequent determination whether the rule is satisfied. If the pertinent inquiry requires application of experience with human affairs, the question is predominantly factual and its determination is reviewed under the substantial-evidence test. If, by contrast, the inquiry requires a critical consideration, in a factual context, of legal principles and their underlying values, the question is predominantly legal and its determination is reviewed independently. [Citation.]" (*20th Century Ins. Co.* v. *Garamendi* (1994) 8 Cal.4th 216, 271 [32 Cal.Rptr.2d 807, 878 P.2d 566].)

Here, as in *20th Century Ins. Co.* v. *Garamendi, supra,* 8 Cal.4th 216, the decision of the superior court amounts to the resolution of a number of questions of law and mixed questions of law and fact that were predominantly legal in nature, rather than factual. Any factual issues raised by the declarations presented below are subordinate to the overall legal questions presented by the statutory interpretation question. We emphasize this point at some length due to our concern that there is an anomaly in the use of a pure de novo standard in this particular area of tax law. However, this de novo standard of review is well enough established for us to proceed to determine the issue anew.

II

*Step Transaction Doctrine*

In *Shuwa, supra,* 1 Cal.App.4th at pages 1648 through 1657, the court set forth the history of the step transaction doctrine as a "corollary of the general tax principle the incidence of taxation depends upon the substance of a transaction rather than its form. [Citation.]" (*Id.* at p. 1648.) ■ Three

basic tests have been developed for application of the step doctrine: (1) the "end result test," in which purportedly separate transactions "will be amalgamated with a single transaction when it appears that they were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result . . . [citations]" (*id.* at p. 1650); (2) the "interdependence test," requiring an evaluation of " 'whether on a reasonable interpretation of objective facts the steps [are] so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series . . .' [citations]" (*id.* at p. 1651) (in other words, the analysis is of the relationship between the steps and asks whether one step would have been taken without any of the others (*id.* at p. 1652)); and (3) the "binding commitment test," requiring that if one transaction is characterized as a first step, there must be a binding commitment to take later steps. (*Id.* at pp. 1650-1653.) The court in *Shuwa* applied all three of the tests and found they were all satisfied by those facts. The court did not comment on whether the use of the tests may be made in the alternative and whether satisfaction of less than all tests is enough to find a step transaction exists.

In *King Enterprises, Inc.* v. *United States* (1969) 418 F.2d 511, 517 [189 Ct.Cl. 466], the court explained that although there are real differences between the step transaction tests, ". . . each is faithful to the central purpose of the step transaction doctrine; that is, to assure that tax consequences turn on the substance of a transaction other than on its form."

In *Associated Wholesale Grocers, Inc.* v. *U.S.* (10th Cir. 1991) 927 F.2d 1517, 1522-1529, the court of appeals found that satisfaction of one of the tests, in that case, the interdependence test, was adequate for application of the step transaction doctrine. The court first found the binding commitment test to be inapplicable where the case does not involve a series of transactions spanning several years. (*Id.* at pp. 1522-1523, fn. 6.) The court then noted that the district court had declined to apply the end result test, and concurred with that approach. In discussing the remaining interdependence test, the court first rejected the taxpayer's claim that its valid business reasons for the steps taken should render inapplicable the step transaction doctrine. Noting that the law is unclear as to the relationship of the doctrine and the business purpose requirement, the court rejected the argument that a valid business purpose could bar application of the doctrine in that context. (*Id.* at pp. 1526-1527.) However, the existence of a business purpose has been considered to be one factor in determining the relationship of form and substance in a transaction; other cases have found a lack of business purpose to justify application of the doctrine. The court concluded that the substance

of the particular transaction justified treating the steps as related for tax purposes. (*Id.* at p. 1529.)

The administrative record before the trial court in this case contains an opinion letter to county assessors from the State Board of Equalization (SBE) explaining the impact of the *Shuwa* case on step transaction doctrine as interpreted by the SBE. The opinion letter notes that the court in *Shuwa* applied all three tests in making its determination, but did not make clear whether the step transaction doctrine may be applied if less than all three tests are satisfied. The letter states, "The only indication of the court's thinking on this issue seems to be the reference to an authority suggesting that different tests are applicable in different contexts. This suggests that not all of the three tests need to be applied in each case in order to establish a basis for the step transactions doctrine." The letter goes on to state the SBE's position as follows: "It is the position of [SBE], therefore, that future step transaction decisions should be made by assessors based upon all of the facts of each transaction. If those facts demonstrate that in substance a change in ownership occurred, then the transaction should be treated accordingly. The existence of independent business purposes for the various steps will not prevent the application of the step transaction doctrine. Finally, the assessor may be aided in determining what the true substance of the transaction was by applying the (1) end result test, (2) interdependence test, and/or (3) binding commitment test, as set forth in the *Shuwa* decision."[3]

For all of these reasons, we conclude that the step transaction doctrine may be applied upon an adequate showing that one or more of the applicable tests is satisfied by the facts presented. We also conclude that the "independent business reason" argument is essentially a defense against the application of the tests, but is only one of many factors to be considered in assessing whether the form of a transaction coincides with its substance. (See *Associated Wholesale Grocers, Inc.* v. *U.S., supra*, 927 F.2d at p. 1526; *Shuwa, supra*, 1 Cal.App.4th at pp. 1653-1657.)

## III

### *Contentions on Appeal*

The County has contended all along that, based on the step transaction doctrine, this case falls under section 61, subd. (i), providing: "Except as

---

[3]Administrative construction of enactments may be relied on by courts to resolve ambiguities and to assist in interpretation of regulations. "When construing article XIII A, courts accord legislative and administrative implementations great weight. [Citations.]" (*Industrial Indemnity Co.* v. *City and County of San Francisco* (1990) 218 Cal.App.3d 999, 1009 [267 Cal.Rptr. 445].)

otherwise provided in section 62, change in ownership, as defined in section 60, includes, but is not limited to: (i) The transfer of any interest in real property between a corporation, partnership, or other legal entity and a shareholder, partner, or any other person."[4]

In response, McMillin-BCED first argues that each of the four steps in this case falls under its own exemption from reassessment. Specifically, Step 1, the transfer of a 70 percent tenancy-in-common interest from Development to Properties is said to be exempt under section 64, subdivision (b) (referring to transfer of real property among members of an affiliated group), and a related regulation, title 18 California Code of Regulations, former section 462, subdivision (j)(2)(A).[5] Regarding Step 2, McMillin-BCED argues that when Development and Properties refinanced the land as tenants-in-common, that transaction was exempt from reassessment under section 62, subdivision (c) (creation of a security interest does not constitute a transfer of ownership), and California Code of Regulations section 462.200, subdivision (a). Regarding Step 3, the exchange of the tenancy-in-common interests for general partnership interests in Scripps Ranch, McMillin-BCED argues that the transaction was exempt from reassessment under section 62, subdivision (a)(2) (referring to transfers among legal entities which change the method of holding title, although in the same proportional interests, as not accomplishing a change in ownership of the land), and California Code of Regulations section 462.020, subdivision (b). Finally, as to Step 4, in which McMillin bought into the Scripps Ranch partnership, which was then restructured, McMillin-BCED argues that the transaction was exempt from reassessment under section 64, subdivisions (a) and (c) (referring to the statutory "non-controlling partnership interest exemption" where a transfer of a noncontrolling ownership interest in a legal entity does not equate to transfer of real property owned by the entities) and California Code of Regulations section 462.180, subdivisions (b)-(d).

McMillin-BCED then argues that the trial court erred in applying the step transaction doctrine to view all of these steps as an interrelated whole

---

[4] "The basic definition of section 60 is intended as a guidepost in cases not covered by the specific inclusions or exclusions of other taxation statutes or article XIII A itself. [Citations.]" (*Industrial Indemnity Co.* v. *City and County of San Francisco, supra,* 218 Cal.App.3d at p. 1010.)

[5] All references in this opinion to rules will be to those found in title 18 California Code of Regulations, section 462 et seq. Since the time of trial, those rules have been changed, without regulatory effect, to renumber former sections 462, subdivisions (a) through (h), and subdivisions (j) through (n) to new sections 462.001 through 462.260. (See history note in § 462.) The text of former section 462, subdivision (j)(2)(A) is now found in section 462.180, subdivision (b). We use the current numbering system in discussing McMillin-BCED's arguments here.

because it should not have found that a unilateral intention of Development and/or Properties to seek an end result was an adequate showing under the end result test, without a showing that McMillin also had such an intent or purpose. McMillin-BCED then argues that the trial court erroneously added a new test to the existing tests, that the proximity in time of the various steps gave weight to the argument that they were interrelated so as to constitute a change in ownership. McMillin-BCED further argues that the substance of this transaction, regardless of the form, showed no change in ownership because Development, as the parent corporation of its wholly owned subsidiary Properties, always controlled the land as well as the partnership that later owned the land, and the third party, McMillin, acquired only a noncontrolling and minority partnership interest.

Finally, McMillin-BCED contends that since it had a legitimate business purpose for each of the steps, the step transaction doctrine should not be applied to allow reassessment of the property.

## IV

### Analysis

In analyzing this series of transactions, our inquiry is whether the tests that have been established for the step transaction doctrine require the transaction to be treated as a whole, "or whether each step of the transaction may stand alone." (*Shuwa, supra,* 1 Cal.App.4th at p. 1648.) As suggested by the SBE in its opinion letter, all the facts of each transaction must be taken into account to determine whether, in substance, a change in ownership occurred. Moreover, the existence of an independent business purpose for each of the various steps, while of significance, does not prevent the application of the step transaction doctrine. (See *Associated Wholesale Grocers, Inc.* v. *U.S., supra,* 927 F.2d at pp. 1526-1527.) Even if only one or two of the relevant tests is satisfied, a step transaction finding may be made for reassessment purposes. And, even where each step may have been made according to a particular exemption from reassessment, the series of steps may be amalgamated and viewed in their entirety if such is necessary to comply with the spirit, rather than the letter, of the change in ownership rules under article XIII A. (*Shuwa, supra,* at p.1648.)

### A

### Timing

At the outset, we dispose of McMillin-BCED's argument that the trial court effectively created a new test when considering the timing of the

various steps in its analysis of the step transaction doctrine. Timing is a valid fact and circumstance to be considered in analyzing the entire set of circumstances. (*Crow Winthrop Operating Partnership* v. *County of Orange* (1992) 10 Cal.App.4th 1848, 1855-1856 [13 Cal.Rptr.2d 696]; *Associated Wholesale Grocers, Inc.* v. *U.S.*, *supra*, 927 F.2d at p. 1528.) Although McMillin-BCED argues that reassessment would have been doubtful if it had waited around two years after Steps 1 through 3 to purchase its partnership interest, those were not the facts before the trial court. Such speculation is not of assistance here.

### B

#### *End Result and Binding Commitment Tests*

■ McMillin-BCED is more persuasive when it argues that the record does not contain evidence supporting a showing that McMillin, the third party who joined the partnership in Step 4, had the same purpose and intent as did Development and Properties in Steps 1 through 3, which dealt with changing the ownership and method of holding title of the land among those affiliated parties. The end result test and the binding commitment test both appear to require the same parties to have been pursuing a related intent throughout the steps of the transaction. (See *Shuwa*, *supra*, 1 Cal.App.4th at pp. 1651-1653.) Apart from inferences which may be drawn from the fact that McMillin once tried to buy the land outright from Development and Properties, there is no factual showing that McMillin participated in or encouraged the activities that Development and Properties went through in Steps 1 through 3.

Moreover, the evidence of an independent business purpose asserted for Steps 1 through 3 raises inferences that there was some legitimate separation between Steps 1 and 3 and Step 4. Specifically, more than one developer was competing to become a candidate to enter into the Scripps Ranch partnership; Davidson was a candidate as well as McMillin. Development and Properties made a showing that they had legitimate income tax reduction purposes (use of Properties' net operating losses) for transferring the tenancy-in-common interests in the property in Step 1. Step 2 had an independent purpose, converting equity to debt in order to realize profit on the land investment and reduce the amount of capital a land developer would have to raise to participate in the land development. Similarly, Step 3, in which the partnership was funded with the land interests, could be seen as preparation for any future development project, in which McMillin might or might not be a participant. Unlike in *Shuwa*, *supra*, 1 Cal.App.4th 1635 and *Crow*

*Winthrop, supra,* 10 Cal.App.4th 1848, there was no clear showing here that all parties were bound to all steps of the multistep plans.

Moreover, the binding commitment test appears to require a sequence of events stretching over a long period of time, perhaps several years, and those facts are not present here. (See *Associated Wholesale Grocers, Inc.* v. *U.S., supra,* 927 F.2d at pp. 1522-1523, fn. 6.) For these reasons, we do not find the application of the end result test or the binding commitment test to result in a conclusive finding that the step transaction doctrine may be applied here.

## C

### *Interdependence Test*

The above conclusions do not end the inquiry. The interdependence test analyzes the relationship between the steps, as opposed to their ultimate result. (*Associated Wholesale Grocers, Inc.* v. *U.S., supra,* 917 F.2d at p. 1527.) In applying the interdependence test, the court evaluates " 'whether on a reasonable interpretation of objective facts the steps [are] so interdependent that the legal relations created by one transaction would have been fruitless without the completion of the series.' [Citations.]" (*Shuwa, supra,* 1 Cal.App.4th at pp. 1651-1652.) Several factors persuade us that the interdependence test is satisfied here, and that the trial court correctly ruled in favor of the County and against McMillin-BCED's request for property tax refunds. All of these steps were related toward accomplishing the purpose of developing the land by an experienced developer, with Development and Properties to have dominant capital- and profit-sharing roles, but an equal management role with the actual developer.

The trial court pointed out at trial that it was significant that in a series of transactions closely related in time, McMillin as an outsider came in to assume all of the entitlement of one of the partners, at specified percentages of capital and profit. The profit was directly related to the percentage of ownership of the third party's predecessor, Development. The way in which this was accomplished was that Development assigned its percentage interest to the partnership, and McMillin then made a $5 million capital contribution and obtained a 14 percent capital interest in the partnership, along with a 30 percent profit interest and a 50 percent management interest. The history of this transaction includes the failed sale to McMillin at an earlier time. A reasonable inference may be drawn that McMillin's goals would not have been accomplished as a developer without the transfer of title from Development, through Properties, to the Scripps Ranch partnership, and ultimately

to the appellant McMillin-BCED partnership. Even if Development and Properties had internal corporate reasons as affiliates to transfer title among themselves, refinance the property, and create a development partnership, those steps would essentially have been fruitless had they not been able to find a developer to join in the project. These steps had the necessary interdependence such that, in substance, a change of ownership occurred.

## D

### Other Arguments

█ McMillin-BCED next claims that as guarantor of Properties' performance, Development somehow remains in control of the land and the partnership, even after it withdrew from the partnership. To state the argument is to demonstrate its absurdity. Development and Properties had significant income tax reasons to treat each other as separate corporations, in order that Development could take advantage of Properties' net operating losses for income tax purposes. They should not now be heard to claim that merely because Properties is a wholly owned subsidiary of Development, it has no independent existence and is identical in interest with Development for these purposes. (See discussion in *Title Ins. & Trust Co.* v. *County of Riverside* (1989) 48 Cal.3d 84, 96 [255 Cal.Rptr. 670, 767 P.2d 1148] of change in control of property as equivalent to change in ownership under § 64, subd. (c), defining change in ownership of property owned by corporations; also see *Shuwa, supra,* 1 Cal.App.4th at p. 1643, fn. 8.) Development's position as a guarantor was created by separate agreement and does not operate in its favor for purposes of determining whether a change in ownership occurred.

Finally, McMillin-BCED defends the various transfers as being geared toward protecting McMillin from incurring liability for predevelopment actions through an outright purchase of the property. Whatever the parties' intentions were to limit McMillin's potential liability as a partner, it should not be assumed that because the transaction was structured in this way, it accomplished only that goal. As pointed out in *Shuwa, supra,* 1 Cal.App.4th 1635, a buyer's desire to limit potential liability from the purchase of partnership interests does not mandate any particular type of transaction to accomplish such an end, as several alternative measures are available to avoid potential partnership liability. (*Id.* at pp. 1656-1657.) We should not view the parties' efforts to shield McMillin from liability for predevelopment activities as also guaranteeing the avoidance of property tax consequences, such as reassessment.

V

*Conclusion*

█ Because of the close relationship of the various steps in this case and because each of these steps, even though having some legitimate business purpose, would have been essentially fruitless had not the ultimate goal been achieved of bringing in an experienced developer to assist in the development of the property, we conclude the interdependence test for application of the step transaction doctrine is satisfied here. The goals of both Development and Properties, as well as McMillin, would not have been accomplished without transfer of title of the property in the manner in which it occurred. The trial court was justified in taking into account the timing and nature of the transactions, as well as the desire to develop the property, as factors supporting application of the step transaction doctrine. An adequate basis exists in the record to justify application of the doctrine in this manner. It is appropriate to affirm the judgment, where correct, regardless of the theories used by the trial court. (*Schultz* v. *County of Contra Costa* (1984) 157 Cal.App.3d 242, 248 [203 Cal.Rptr. 760].)[6]

DISPOSITION

The judgment is affirmed.

Benke, Acting P. J., and Nares, J., concurred.

A petition for a rehearing was denied February 6, 1995, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied March 30, 1995.

---

[6]Because of our conclusions in this respect, we need not discuss McMillin-BCED's contentions concerning an attorney fees award. (§§ 538, 5152.)