[No. D058957. Fourth Dist., Div. One. Oct. 24, 2012.]

MAUREEN CORREIA MAUGHAN, Individually and as Trustee, etc.,
Plaintiff and Respondent, v.
MAURICE P. CORREIA, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION¹]**

---

[1] Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of Discussion parts A.–D.

508

Counsel

Law Offices of Martin N. Buchanan and Martin N. Buchanan for Defendant and Appellant.

Anderson & Anderson, Steven A. Micheli and J. Jan Akre for Plaintiff and Respondent.

Opinion

BENKE, J.—

I

INTRODUCTION

This is a dispute between a sister and brother over their respective holdings in a family run corporation. Royal Hospitality, Inc. (RHI), is an S corporation owned entirely by six siblings of the Correia family.[2] RHI's sole business is the operation of a hotel in San Diego that had been previously owned and operated by plaintiff Maureen Correia Maughan (Maureen), her former husband Ben Maughan (Ben) and her parents Mary and Maurice F. Correia (the Correias).

Defendant Maurice P. Correia (Maurice), Maureen's brother, formed RHI for the specific purpose of purchasing the hotel after the Maughans and the Correias became delinquent on their loan payments and the bank foreclosed. After that purchase, Maureen and Maurice became enmeshed in a dispute regarding how ownership of RHI ultimately would be apportioned among them, their parents and their other siblings. Maurice maintained that he was initially, and for a period of several years would continue to be, the sole owner of RHI, but that after a certain period of time, Maureen and the other family members would be able to exchange the value of their capital contributions to RHI for equity in the company. Maureen insisted that she and Ben, Maurice and the Correias had agreed that each would be one-third owners of RHI, without regard to the amount of their respective capital contributions, that Maurice would be president and the sole owner "on title" after the purchase of RHI, and that shares of RHI would later be distributed to the Maughans and the Correias according to their one-third shares.

---

[2] For the sake of clarity, we refer to the individual parties and the other Correia siblings by their first names. We mean no disrespect in doing so.

This lawsuit arose out of an agreement Maureen alleged she and Maurice entered into for the purpose of resolving their differences regarding the ownership of RHI. Maureen alleged that she and Maurice entered into an oral agreement (the stock option agreement) whereby Maurice promised to allow Maureen to exercise an option to purchase up to a one-third share of RHI, in exchange for Maureen's promise to relinquish any claim she might have to a different allocation of RHI shares. When Maureen tried to exercise that option, Maurice refused to allow her to do so. Maurice disputed that the stock option agreement existed.

In 2008, Maureen sued Maurice, seeking, among other things, to enforce the stock option agreement. After a bench trial, the trial court issued a statement of decision in which it concluded that the oral stock option agreement was valid and binding, and that Maurice had breached that agreement when he refused to allow Maureen to exercise her option to purchase an additional minority interest in RHI. The trial court awarded Maureen $1,320,959 in damages, representing the difference between the value of the minority interest Maureen would have acquired absent Maurice's breach, and the purchase price for that interest specified in the stock option agreement.

On appeal, Maurice contends that the trial court's decision is unsupported by substantial evidence. He also argues that Maureen failed to prove that he (as opposed to RHI) was a party to the stock option agreement, and, further, that Maureen should have been judicially estopped from enforcing the stock option agreement, because the existence of that agreement is fundamentally inconsistent with Maureen's prior litigation position regarding her alleged one-third ownership of RHI. Alternatively, Maurice contends that Maureen's damages should be reduced due to the trial court's legal error in calculating the value of the minority interest Maureen was entitled to acquire under the stock option agreement.

We conclude that substantial evidence supports the trial court's finding that the parties entered into a valid and binding oral agreement. Because Maurice failed to raise his other challenges to the enforceability of the stock option agreement in the trial court, we hold they are not properly raised on appeal for the first time, although we believe those arguments to be without merit in any event. We agree with Maurice, however, that the trial court incorrectly calculated Maureen's minority interest in RHI for purposes of determining her damages, and therefore we reduce the total damages award to $1,126,159. We affirm the judgment as so modified.

## II

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Origins of the Parties' Dispute Over Ownership of RHI*

In 1988, the Correias, Maureen and Ben purchased a hotel in San Diego formerly known as the Sands Hotel, which was later converted to a Ramada Inn. By mid-1992, the hotel was encumbered with three loans, the first provided by Girard Savings Bank, the second by Peninsula Bank and the third by an individual named Albert R. LeGaye. The business was not profitable, and the Maughans and Correias fell behind on their payments to Girard Savings Bank. That bank foreclosed on the property in December 1992, and Peninsula Bank purchased it at the foreclosure sale. The sale included only the real estate; Peninsula Bank did not obtain title to the personal property located at the hotel, which remained under the ownership of the Maughans and the Correias. Notwithstanding the foreclosure, the Maughans and the Correias continued to operate the hotel under an agreement with Peninsula Bank.

Maureen and Maurice approached Peninsula Bank for the purpose of discussing how the Correia family could repurchase the hotel. The bank made it clear that it could not sell the hotel to the same persons who had defaulted on the prior loan. However, the bank indicated that it would be willing to sell the hotel to Maurice, who had not been involved with the prior operation of the hotel, or to a corporation. Accordingly, with the family's agreement, Maurice, who is an accountant, formed RHI and handled the purchase of the hotel in December 1992.

Maureen alleged that at the time of RHI's purchase, she, Ben, her parents and Maurice had agreed that the hotel would be jointly owned by Maurice, the Maughans and the Correias, with each holding a one-third interest in the business, regardless of the amount of money each of them had personally invested in the hotel (the one-third ownership agreement). It was agreed, Maureen testified, that Maurice would be president of RHI and would initially be the "title" owner, and that stock would issue to the rest of the family at some point in the future. She thought she and the others would be put on title later. Throughout the period of time leading up to the stock option agreement, Maureen continued to believe that she was rightfully entitled to a one-third share of RHI without having to pay for it, pursuant to the one-third ownership agreement. Maurice denied any such agreement had been reached. He testified that he had been the sole shareholder from 1992 to 1997, and had told Maureen and the other family members that their personal monetary contributions to the hotel would be considered loans, and that after a period

of five years from the purchase date, they could exchange that debt for a proportional ownership share in the hotel, up to one-third.

### B. *The LeGaye Litigation*

In 1994 and 1995, the Correias, RHI, the Maughans and Peninsula Bank were involved in litigation against Sands Hotel Associates and LeGaye, the former owners of the hotel (the LeGaye litigation). In that lawsuit, LeGaye filed a cross-complaint alleging that the 1992 foreclosure sale was a sham designed to extinguish his junior lien on the property, and that the Maughans and the Correias were still owners of the hotel after the foreclosure. In connection with summary judgment proceedings in that case, Maureen and Mary submitted declarations under oath in which they denied holding any ownership interest in the hotel or RHI after the foreclosure. Based on these declarations, the court granted summary judgment in favor of the Maughans and the Correias, finding that they had not defrauded LeGaye and did not retain any ownership interest in the property.

Maureen testified at trial that Maurice had asked her to sign the declaration so the family could keep the hotel, and despite the one-third ownership agreement, she believed those declarations to be true as she had not yet received any stock in RHI and never entered into any agreement with Peninsula Bank to have the hotel transferred back to her or Ben. According to testimony Maurice presented at trial, Maureen never mentioned the alleged one-third ownership agreement to the attorney who represented her in the LeGaye litigation and who prepared her declaration.

### C. *The Stock Option Agreement*

After the Correias passed away, Maurice informed his siblings in early 1997 that he planned to issue RHI stock to each of them according to schedules he had prepared purporting to calculate each family member's "cash" contributions to RHI since 1992. According to these calculations, Maurice would own approximately 74 percent of RHI, the Maughans 7 percent, and the other siblings—Mark, Michelle, Mardel and Martin—together would acquire approximately 19 percent as heirs of the Correias.

The Maughans disputed these allocations. In particular, Maureen raised with Maurice the following issues: (1) whether the allocation should instead be based on the one-third ownership agreement and (2) whether, if the allocation should be based on personal contributions, Maurice should take into account, among other things, the value of the personal property that the Correias and the Maughans had purchased for the hotel, the value of the Ramada franchise Maureen had helped to secure, and the fact that Maureen

had worked as general manager for the hotel, frequently for no salary or below-market compensation. Maurice insisted, however, that he would not issue stock based on "intangibles"—which, according to Maurice, included the value of the personal property and Maureen's "sweat equity," but also included his own efforts in keeping the hotel afloat during lean years, and the fact that he personally guaranteed loans to the hotel. For almost a year, the parties continued to discuss these issues.

Finally, in October 1997, Maurice made a proposal to Maureen in an effort to resolve this dispute. "[T]he best thing for everyone," he stated, was to "pay me [(Maurice)] off . . . to reduce my ownership percentage." Specifically, he proposed alternative means by which Maureen could acquire up to a one-third interest in the hotel. Maurice provided Maureen in late 2007 with schedules and ownership percentages, demonstrating how her purchase of a total one-third share would decrease both Maurice's cash contributions, or "loans," to the hotel, and his corresponding interest in RHI. Maureen understood that under these proposals she would be paying Maurice for her interest and obtaining the stock from him.

By early 1998, the parties entered orally into the stock option agreement. Maurice prepared a document memorializing that pursuant to this agreement, the Maughans had 10 years to exercise their option to purchase up to a one-third interest in RHI, at the price of $262,800 plus two points over the prime interest rate. In exchange, the Maughans understood that they were relinquishing any claim they might have had that the shares of RHI should be differently allocated—specifically, according to the one-third arrangement they believed Maurice had agreed to after the purchase of the hotel in 1992.

The document setting forth these terms stated that it was an agreement "between Ben & Maureen A. Maughan (Maughan) and Royal Hospitality Inc. (The Corporation) which gives Maureen the option to purchase up to 33.33% of the stock in the Corporation." Nevertheless, Maureen testified that her agreement was with Maurice. The document then recited the "events leading up to the stock option," including that Maurice "owned 100% of the Corporation" from its inception, and that the Maughans made loans to RHI thereafter. It further stated that the Maughans, Maurice and the estate of the Correias had made loans to RHI, which under the stock option agreement would be exchanged for shares in the corporation. Maureen testified that by paying Maurice the option price, she understood that she effectively was reimbursing him for the "loans" he had made to RHI, and obtaining the stock from him. Ben also testified at his deposition that he understood the agreement involved paying Maurice to buy a portion of his stock. Their understanding was consistent with schedules Maurice had prepared in February 1998, showing that if Maureen had exercised the option at that time for

$267,200, that sum would have been treated as a deduction from Maurice's contributions to the hotel and added to the Maughans' contributions, adjusting their respective RHI ownership percentages accordingly.

After detailing the option period and the price, the document memorializing the stock option agreement provided signature lines for Maurice, Maureen and Ben, under the statement "By signing below I certify that, to the best of my knowledge and belief, . . . the information set forth in this statement is true, complete and correct." The parties, however, never signed the document. According to Maureen, she and her husband orally agreed to the stock option agreement, but she did not sign the written document because the stock option agreement was one between family members, she and Maurice had been "very close," and Maurice did not ask her to sign it. Ben similarly testified that "[n]o one asked us to sign it." Both Maureen and Ben testified that they did not agree with the recitals of the history of the parties' respective ownership positions. Nevertheless, they orally agreed to the stock purchase option arrangement in order to put to rest their dispute with Maurice regarding ownership of RHI.

For his part, Maurice testified at trial that he thought there was no agreement because Maureen had told him she would never have the money to purchase the additional shares. For that reason, Maurice testified, he believed the stock option agreement was "a dead issue." Maureen, however, testified that her inability to pay for the entire one-third interest at that time explained why the agreement gave her 10 years to exercise the option.

### D. The Parties' Subsequent Conduct and Maurice's Breach of the Stock Option Agreement

Subsequent to entering into the oral stock option agreement, the parties conducted themselves in a manner the trial court found to be consistent with the existence of that agreement. For example, Maureen no longer contested Maurice's stock allocations. Maureen never spoke to Maurice about the stock option agreement after 1998 until 2005. In 1998, Maurice issued stock to each member of the family in accordance with the allocations he had developed in connection with the stock option agreement. Distributions of profits were made to all the siblings according to the allocations Maurice had calculated in connection with the stock option agreement, and Maureen did not contest those distributions. Additionally, Maurice explained to Maureen how incremental purchases of stock under the agreement could be treated as a gift for tax purposes. Finally, tax returns and K-1 schedules were prepared according to those same ownership allocations.

Two issues left unresolved by the stock option agreement concerned the personal property at the hotel and the value of Maureen's "sweat equity"

contributions to the hotel. Maurice testified that the stock option agreement did not give credit for anything but a cash payment. In June 1998, Maureen told Maurice that she had been looking into how she and the Correias' estate could obtain some tax benefit from their investment in the personal property of the hotel, since no credit for that property was given in Maurice's allocation of stock in RHI. Maureen also spoke with another accountant about possible tax benefits to be realized from ownership of the personal property. Maureen testified that these discussions had nothing to do with the stock option agreement or the allocations of RHI stock thereunder. Maurice testified that he had no personal interest in this matter, since he did not own the personal property and the Maughans and heirs of the Correias could do whatever they deemed appropriate in that regard.

Additionally, in June 1998, Maurice negotiated with Maureen a bonus program to recognize the personal services she provided the hotel as general manager. The bonus was based on her future performance, and did not include compensation prior to 1998 or relate to the stock option agreement.

Finally, in 1999, Maurice proposed to Maureen a deferred compensation plan pursuant to which Maureen could acquire a percentage of the equity in RHI that would be realized upon a future sale of the hotel. Maureen testified that Maurice told her he was concerned she would never have the money to purchase her one-third interest, and "it would be a shame that [Maureen did] not get anything." The proposed plan, according to Maureen, would "reward[] [her] for [her] efforts." Maurice testified that the proposed plan was meant to be in lieu of, not in addition to, the stock option agreement. For example, Maurice sent Maureen an e-mail in 2006 stating that the deferred compensation plan had always been intended "to replace any option to purchase stock because you and Ben did not have the money to buy your interest." Maurice testified that he could not responsibly do both the stock option agreement and the deferred compensation agreement. In contrast, Maureen testified that Maurice never told her at the time that the proposed deferred compensation agreement would supplant the stock option agreement.

The draft deferred compensation agreement stated that it was intended in part to resolve any outstanding claims Maureen might have regarding her compensation as general manager of the hotel, as well as remaining claims she might have as to ownership of RHI. Maurice testified that by the latter, he was referring to the unresolved personal property issue. However, Maurice and Maureen never agreed to the terms of the deferred compensation plan.

In 2002, Maureen and Ben divorced. They initially split their shares in RHI, and Maurice reissued the Maughans' shares accordingly. In 2006, Maureen decided to purchase all of Ben's stock and interest in RHI, including his rights under the stock option agreement. She accomplished this with the assistance of Maurice, who helped her calculate the purchase price for Ben's interest.

By 2005, the value of the hotel had increased dramatically. Maurice testified that the value of the hotel at the time the stock option agreement was negotiated was about $7 million. In July 2006, Maurice had received a statement of interest from a potential buyer, suggesting a purchase price of $15 million. Maurice made a counterproposal of $18 million. No deal was consummated with that individual. When Maureen purchased Ben's interest in RHI in October 2006, the value of his interest was based on an overall value for the business of $15,570,000, which is what Maurice believed to be a fair market value for the hotel at that time.

By August 2006, Maureen had told Maurice that she wanted to exercise the stock option and purchase the full additional 22.283 percent of RHI stock available to her by virtue of the stock option agreement and her purchase of Ben's rights under that agreement. Maureen presented evidence that she was ready, willing and able to pay for the option at that time. The option price, including interest, was $487,000. Maurice, however, told Maureen that "he would not honor the option." According to Maureen, Maurice never denied the existence of the stock option agreement; he simply stated he would not honor it. Maurice testified, however, that he told Maureen there was no such agreement. The parties continued to discuss this matter over a period of months, but Maurice continued to refuse to allow Maureen to exercise the option.

### E. *The Instant Litigation*

Maureen commenced this litigation in April 2008. Initially, Maureen, Mark, Michelle and Mary's estate joined as plaintiffs in a complaint naming Maurice, RHI, Mardel, Martin, Maurice's wife and Mardel's husband as defendants, and alleging 13 causes of action. The complaint alleged a variety of alternative theories by which Maureen sought relief against Maurice, including breach of fiduciary duty, fraud, conversion, imposition of a constructive trust and an accounting of RHI. Many of Maureen's original claims were based on the alleged one-third ownership agreement, but the ninth and tenth causes of action sought relief based on the stock option agreement, referring to that latter agreement as "the Maughan Settlement Agreement."

Maureen sought a temporary restraining order and preliminary injunctive relief against Maurice that primarily raised concerns about Maurice's management of the hotel, and asked the trial court to place restraints on Maurice's powers regarding operation of the property and control of its finances. In papers submitted in support of the motion, Maureen stated, among other things, that the ownership of the property "has not changed from the original one-third each agreement in December 1992," and that one of the goals of the lawsuit was to have her declared a one-third owner of RHI. Maurice opposed the motion, arguing, among other points, that Maureen's claim of one-third ownership should be estopped by virtue of her position in the LeGaye litigation denying any ownership interest in RHI. Maurice also emphasized the fact that despite her allegations about the one-third ownership agreement, Maureen had accepted without complaint Maurice's stock distributions in 1998, and dividends on that stock thereafter, in accordance with the schedule of ownership he developed at the time of the stock option agreement.

The original trial judge presiding over this case, the Hon. Ronald S. Prager, granted the requested injunction. In his order, Judge Prager observed that in her papers, Maureen had provided evidence indicating that her declaration submitted in the LeGaye case, in which she denied any RHI ownership, may have resulted from "ignorance" and had possibly been induced by fraud. Judge Prager concluded "Plaintiffs' declaration evidence establishes a reasonable possibility that [Maurice] entered into an ownership agreement with Plaintiffs that RHI would be owned one-third each by [the Correias], the Maughans, and [Maurice] with the understanding that all monies contributed to the hotel would be considered loans to be repaid by the hotel business." Judge Prager also concluded that Maureen had shown a reasonable probability that she would prevail on her claims that Maurice had mismanaged the hotel and improperly taken the assets of RHI.

Maureen filed a first amended complaint in March 2009 that was substantially similar to her original complaint in all respects material to this appeal. That same month, Maurice filed a motion for summary adjudication as to Maureen's claims arising under the alleged one-third ownership agreement. Specifically, he contended that those claims were barred by the statute of limitations and/or the doctrine of judicial estoppel. Similar to his argument in opposition to the preliminary injunction motion, Maurice argued that Maureen was estopped from enforcing the alleged one-third ownership agreement because she had disavowed any ownership of RHI, under oath, in the LeGaye litigation. In June 2009, Judge Prager granted Maurice's motion as to all causes of action based on the one-third ownership agreement,

concluding not only that these claims were barred by the statute of limitations, but also that Maureen's allegations about that agreement were inconsistent with the position she took in the LeGaye litigation. Judge Prager denied the motion as to the ninth and tenth causes of action, which he explained addressed only the stock option agreement.

· As a result of the summary adjudication ruling, settlements with the other Correia siblings, and a March 2010 stipulation, only Maureen and Maurice remained parties to the lawsuit, and only the ninth and tenth causes of action in Maureen's complaint remained to be tried. The parties tried those claims over five days before the Hon. Judith F. Hayes. After trial, Maureen voluntarily dismissed the tenth cause of action for specific performance of the stock option agreement.

On October 27, 2010, the trial court issued its final statement of decision, ruling in favor of Maureen on her ninth cause of action against Maurice for breach of the stock option agreement. The trial court found that Maurice and Maureen had entered into a valid and binding oral agreement in late 2007 or early 2008 whereby plaintiff was entitled, within a period of 10 years and for a specified price, to purchase up to 22.283 percent of RHI stock (which would give her a total one-third interest), in exchange for which Maureen relinquished any claim she might have to pursue a different allocation of RHI stock. The trial court additionally found that Maureen was ready, willing and able to exercise that option in 2008, and that Maurice breached the contract when he refused to allow her to do so. The trial court awarded Maureen $1,320,959 in damages, which included a 40 percent minority discount to account for the fact that Maureen's interest in RHI did not enable her to exercise control over the corporation. The trial court entered final judgment in favor of Maureen on November 9, 2010. Maurice's appeal followed.[3]

III

DISCUSSION

A.–D.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[3] Maureen filed a cross-appeal, but later stipulated to its dismissal.

[*]See footnote, *ante*, page 507.

E. *The Trial Court Incorrectly Applied the Minority Discount in Calculating Plaintiff's Damages*

Having affirmed the trial court's judgment on liability, we now turn to Maurice's alternative argument that the trial court erred in applying the minority discount to its calculation of Maureen's damages. Where, as here, the parties do not dispute that a minority discount should be applied, and where the underlying facts regarding damages are not otherwise in dispute, we review de novo the question of whether the trial court misapplied the minority discount in its damages calculation. (See, e.g., *McMillin-BCED/-Miramar Ranch North v. County of San Diego* (1995) 31 Cal.App.4th 545, 553 [37 Cal.Rptr.2d 472] [when an issue presented on appeal requires application of law to an undisputed set of facts, appellate court may review that issue de novo and draw its own conclusions of law].)[9]

The parties agree that the measure of Maureen's damages for Maurice's breach of contract is the difference between the fair market value at the time of the breach of the additional RHI stock Maureen sought to purchase, and the agreed-upon option price for that stock. (See, e.g., Civ. Code, § 3300 [damages for breach of contract is "the amount which will compensate the party aggrieved for all the detriment proximately caused thereby"); see also *Scully v. US WATS, Inc.* (3d Cir. 2001) 238 F.3d 497, 510 (*Scully*) ["damages are calculated by taking the difference between a stock option's exercise price and the market price of the same stock at the time of breach"]; *Hermanowski v. Acton Corp.* (2d Cir. 1984) 729 F.2d 921, 922 ["[T]he proper measure of damages is the difference between the market value of the stock and the option price."); cf. *Oldenkott v. American Electric, Inc.* (1971) 14 Cal.App.3d 198, 204 [92 Cal.Rptr. 127] [in case alleging breach of employment option contract, court assumes that "damages for the loss of the option right is the loss of its value . . ."].)

Initially, Maurice maintained that damages were too speculative and thus could not be awarded at all. After trial, Maurice argued that if liability were found, Maureen was entitled, at most, to $767,000 in damages, which included application of a 50 percent minority discount. For her part, Maureen urged the trial court to use in its damages calculation a higher valuation for the corporation than the court ultimately used, and also argued that the court should credit her with stock dividends and not apply any minority discount. On appeal, however, the parties pursue none of these arguments. The only

---

[9] Additionally, we agree with Maurice that whether the trial court properly applied the minority discount in this case is a legal question akin to whether the trial court used the correct measure of damages, which we review de novo. (See, e.g., *Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 315 [96 Cal.Rptr.2d 747, 1 P.3d 63].)

issues we are asked to determine with respect to damages are: (1) whether the trial court deducted the minority discount at the appropriate point in the damages calculation and (2) if it did not, whether we are permitted on this appeal to correct that error by modifying the damages award.

■ "A minority discount adjusts for lack of control over the business entity on the theory that noncontrolling shares of stock are not worth their proportionate share of the firm's value because they lack voting power to control corporate actions." (*Lawson Mardon Wheaton, Inc. v. Smith* (1999) 160 N.J. 383 [734 A.2d 738, 747] (*Lawson Mardon Wheaton*).) In calculating plaintiff's damages in this case, the trial court decided to apply a 40 percent minority discount because "a minority interest in a closely held corporation would be difficult to market, especially in light of the relatively low rate of return on an investment in the hotel." It would appear, based on this finding, that the trial court possibly was confusing a "minority discount" with what is known as a "marketability discount." The latter "adjusts for a lack of liquidity in one's interest in an entity, on the theory that there is a limited supply of potential buyers for stock in a closely-held corporation." (*Lawson Mardon Wheaton, supra*, 734 A.2d at p. 747.) Neither party here focuses on whether the trial court used the correct terminology for the discount applied in this case, and since what is at issue is the fair market valuation of a minority interest in an S corporation, it likely was within the court's discretion to apply either, or both, in calculating plaintiff's damages. Because the parties do not challenge on appeal the trial court's decision to apply a discount at all, the terminology used by the court is not pertinent to our analysis.

In calculating plaintiff's damages, the trial court applied the minority discount as follows:

| | |
|---|---|
| "September 2006 Hotel Value: | $15,750,000.00 |
| "Less Secured Debt: | ($3,684,304.00) |
| "Equals Net Value of RHI: | $12,065,696.00 |
| "Value of Maureen's 22.283% RHI stock: "[share of RHI] | $2,688,599.00 |
| "Less Stock Option Purchase Price | $487,000.00 |
| "Damages Subtotal: | $2,201,599.00 |
| "Less 40% Minority Interest Discount | $1,320,959.00" |

Maurice's challenge to this calculation is straightforward: By deducting the minority discount after, instead of before, subtracting Maureen's stock option purchase price, he argues, the trial court effectively gave Maureen a 40 percent discount off the contract price for exercising her option. This was error, Maurice contends, because the discount is meant to be applied only to the value of Maureen's proportional share of RHI, not to the price at which she agreed to acquire that share. Maureen does not contend, in response, that the trial court's application of the discount was legally sound. Rather, she maintains that the damages awarded are, in any event, supported by substantial evidence, and thus no change in the amount of damages is warranted.

■ There is little case law to guide us in evaluating the merits of Maurice's argument. However, the authority Maurice cites, and that which our own research reveals, leads us to conclude that he is correct. Because minority discounts are relevant to the value of a minority share of the corporation, when they are applied, they are deducted from the minority shareholder's pro rata share of the value of the corporation. (See *Lawson Mardon Wheaton, supra,* 734 A.2d at p. 747; see also Leacock, *The Anatomy of Valuing Stock in Closely Held Corporations: Pursuing the Phantom of Objectivity into the New Millennium* (2001) 2001 Colum. Bus. L.Rev. 161, 198–199, fn. 174 [minority discount is " '[t]he *reduction, from the pro rata share of the value of the entire business*, to reflect the absence of the power of control' " (italics added)].)

Thus, applying a minority discount generally is a two-stage procedure. First, the value of the entire corporation is determined, and then apportioned among the various interests. "[T]he pro rata value would be the first-stage estimate of the fair market value of the shares." (Comment, *Valuing Closely Held Stock: Control Premiums and Minority Discounts* (Winter 1982) 31 Emory L.J. 139, 143.) In the second stage, the minority discount is deducted from that pro rata value. (*Id.* at p.143.) "[T]he value of a minority share . . . is its first-stage value . . . minus the minority discount." (*Id.* at p. 145.)

We have found no case, and Maurice cites none, in which a court has laid out in this fashion its fair market valuation of a minority interest as part of a damages calculation. But it is apparent that the procedure outlined by the authorities cited above is not the one the trial court used in this case. The trial judge did not deduct the minority discount from the value of the 22.283 percent interest Maureen was entitled to purchase under the stock option agreement, which would have resulted in a discounted fair market value of $1,613,159.40 for Maureen's additional minority interest, and damages of $1,126,159.40 (after subtracting the contract purchase price). Rather, the court first deducted the contract price from the value of Maureen's undiscounted minority interest, and then applied the minority discount. This

resulted in additional damages to Maureen in the amount of $194,800 (rounded to the nearest dollar).

The trial court's damages calculation is not consistent with the purpose of the minority discount, which, as the court acknowledged, is to "obtain a fair valuation of a minority interest." We note that the trial court cited Maureen's purchase of her former husband's shares in 2006 as additional justification for applying a 40 percent minority discount, but in that transaction, Maureen determined the price at which she would purchase that interest by applying the discount directly to the value of her former husband's proportional ownership to RHI. In addition, the $487,000 price at which Maureen could exercise her option was a bargained-for, firm price mandated by the terms of the stock option agreement—specifically, $262,800 plus interest at two points over the prime rate. That option price was an independently negotiated sum, not tied to the fair market value of Maureen's interest. Maureen points us to nothing in the agreement, or otherwise to anything in this record, that entitles her to a discount off that price.

■ To be consistent with the law, the purpose of the minority discount, and the parties' past treatment of this issue, and in fairness to Maurice, the trial court should have applied the 40 percent discount directly to the value of the additional minority interest Maureen was entitled to purchase pursuant to the stock option agreement, so that Maureen's damages would reflect the true "intrinsic value" of her stock option. (See *Scully, supra,* 238 F.3d at p. 510.) Instead, the trial court provided Maureen with a windfall of almost $200,000, thereby prejudicing Maurice. (See, e.g., *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800 [16 Cal.Rptr.3d 374, 94 P.3d 513] [prejudicial error exists where " 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' "].)

Neither acknowledging nor disputing the trial court's error, Maureen contends that the amount awarded is between what Maurice argued she was entitled to (about $767,000) and the amount Maureen originally sought (over $3 million), and therefore is supported by substantial evidence. According to Maureen, this prevents us from making any modification to the damages award, even on the basis of a clear legal error. We disagree.

Maureen cites *San Diego Metropolitan Transit Development Bd. v. Cushman* (1997) 53 Cal.App.4th 918 [62 Cal.Rptr.2d 121] to support her argument, but that case is distinguishable. There, the jury had to determine damages based on two diametrically opposed expert opinions that varied not only in amounts but also in methodologies and factors considered. (*Id.* at pp. 924–925.) The damages the jury awarded fell between the contrasting figures presented by the experts. (*Id.* at p. 931.) In such circumstances, it is

well established that " '[t]he trier of fact may accept the evidence of any one expert or choose a figure between them based on all of the evidence.' " (*Id.* at p. 931.)

■ In this case, however, the damages awarded cannot reasonably be interpreted as reflecting a "middle ground" between two conflicting expert opinions. Rather, the parties were generally in agreement as to *how* damages should be measured (the fair market value of Maureen's minority interest less the contract price), and in keeping with that measure, the trial court performed a series of specific mathematical functions employing certain amounts (and rejecting others) proposed by the parties for each factor in the equation. Maurice does not challenge the trial court's exercise of its discretion in choosing each specific value in the equation. Instead, he challenges only the point at which the trial court applied the minority discount in the calculation. Although the court's choice to apply a minority discount at all may involve an exercise of its discretion (and that choice is not at issue here),[10] based on the foregoing law, we do not view *how* the trial court applied the discount to be a discretionary function. The discount, if it is applied, must be applied in a manner consistent with the law.

When the trial court makes a clear, uncontroverted and prejudicial error of law in the calculation of damages, the appellate court has the power to modify the judgment to correct that error. (See, e.g., Code Civ. Proc., § 43 [the Courts of Appeal "may affirm, reverse, or modify any judgment or order appealed from"]; 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 860, pp. 922–923 [court may modify judgment to correct legal error clearly shown on record, even if substantial]; *Telegraph Avenue Corp. v. Raentsch* (1928) 205 Cal. 93 [102, 269 P. 1109] [court modified judgment by striking from award an amount that had no basis in law]; *Bardis v. Oates* (2004) 119 Cal.App.4th 1, 26–27 [14 Cal.Rptr.3d 89] [modifying judgment to reduce excessive punitive damages award].)[11] For the foregoing reasons, we reduce Maureen's damages to $1,126,159.

---

[10] See, e.g., *Swope v. Siegel-Robert, Inc.* (E.D.Mo. 1999) 74 F.Supp.2d 876, 915 (question of whether to apply discounts is properly left to district court's discretion); but see *Lawson Marden Wheaton, supra,* 734 A.2d at page 746 (whether to apply marketability discount implicates question of law and therefore is subject to de novo review).

[11] Maurice raised this issue at a posttrial hearing addressing the parties' comments on and objections to the preliminary statement of decision. The trial judge indicated that she would "go back and take another look at it." Maureen's counsel took no position on the issue at that time. The trial court did not address the issue in its final statement of decision. Based on this record, we presume that, the issue having been squarely presented, the trial court either purposefully rejected Maurice's argument, or inadvertently neglected to make the adjustment he requested in the final statement of decision. Either way, we are empowered to modify the damages award because it appears clearly in the record and Maureen cites no law suggesting that the court's application of the minority discount was proper.

## IV

## CONCLUSION

The trial court's judgment of November 9, 2010, is modified to reduce the damages awarded from $1,320,959 to $1,126,159. As modified, the judgment is affirmed. The parties shall bear their own costs on appeal.

McConnell, P. J., and McDonald, J., concurred.