Filed 12/24/14  Barton v. RPost International CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| KENNETH BARTON,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>RPOST INTERNATIONAL LIMITED et al.,<br><br>        Defendants and Appellants. | B251722<br><br>(Los Angeles County Super. Ct.<br> No. YC061581)<br><br><br>**ORDER MODIFYING OPINION<br> [NO CHANGE IN JUDGMENT]** |

It is ordered that the opinion filed herein on December 9, 2014, be modified in the following particulars:

On page 19, the first sentence of the second paragraph reads:  "In this case, defendants' expert Henry concluded the value of Barton's common shares at the time of conversion was zero, while Barton's expert d'Almeida concluded the value was $2.43 per share for a total value of $98,004,076."  The sentence should be replaced with "In this case, defendants' expert Henry concluded the value of Barton's common shares at the time of conversion was zero, while Barton's expert d'Almeida concluded the value was $2.43 per share for a total value of $14,649,600."

On page 23, under the heading "Prejudgment Interest," the second sentence of the first paragraph should be changed from "This is correct" to "This is not correct."

There is no change in judgment.

_____

TURNER, P. J.                                                                                    KRIEGLER, J.

Filed 12/9/14  Barton v. RPost International CA2/5 (unmodified version)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

|  |  |
|---|---|
| KENNETH BARTON,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RPOST INTERNATIONAL LIMITED et al.,<br><br>Defendants and Appellants. | B251722<br><br>(Los Angeles County Super. Ct. No. YC061581) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stuart M. Rice, Judge.  Affirmed as modified.

Ben-Zvi & Associates and Henry Ben-Zvi for Defendants and Appellants.

McGarrigle, Kenney & Zampiello, Patrick C. McGarrigle, Michael J. Kenney, for Plaintiff and Respondent.

_____

Defendants and appellants RPost International Limited (RIL), Zafar Khan and Terrance Tomkow appeal from a judgment following a bench trial in favor of plaintiff and respondent Kenneth Barton in this action for conversion of stock. On appeal, defendants contend: (1) the statute of limitations began to run when Barton brought lawsuits for delivery of stock certificates or suspected the claims; (2) Barton improperly split his claims into multiple lawsuits; (3) the trial court should have applied Bermuda law and found defendants had no fiduciary duty to shareholders; (4) Barton's unfair competition claim should have been denied, because he was not a consumer or competitor of RIL; (5) there is no substantial evidence to support conversion, because Barton did not pay for his shares; (6) there is no evidence to support the finding of fraud; (7) the amount of compensatory damages is too speculative; (8) damages could not be awarded as restitution under Business and Professions Code section 17200; (9) there is no evidence of emotional distress to support noneconomic damages; (10) the amounts awarded for punitive damages were excessive; and (11) prejudgment interest should not have been awarded.

We conclude the trial court's finding of liability based on conversion is supported by substantial evidence. Barton provided consideration for his shares and discovered the conversion of his shares on July 7, 2009. Barton did not split his claims, because he did not have a viable claim for conversion when he filed lawsuits in 2005 and 2006. Because we conclude the trial court's finding of liability is supported by substantial evidence of conversion, we need not consider whether defendants were additionally liable under theories of fraud, breach of fiduciary duty and unfair competition. The trial court's award of compensatory damages is supported by substantial evidence and not unreasonable. The punitive damage awards are also supported by substantial evidence of reprehensible conduct and defendants' net worth. No abuse of discretion has been shown with respect to the award of prejudgment interest. However, we agree there is no substantial evidence of emotional distress to support noneconomic damages.

2

Barton appeals from the portion of the judgment in favor of respondents Carole Krechman and Ellsworth Roston. He contends the undisputed evidence shows Krechman and Roston are equally liable for conversion of his shares of stock. We conclude there is no evidence Roston or Krechman are liable for conversion. We modify the judgment by deducting emotional distress damages, and as modified, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

### Corporate History and Prior Litigation

In 1999, Tomkow, Barton and Khan founded the Nevada corporation RPost, Inc. to develop and market technology that Tomkow developed for e-mail similar to certified mail. Barton's role was marketing, business development, and raising capital. In September 2000, the founders converted their loans to RPost into equity in the company. Barton was issued 289,500 shares of RPost stock in exchange for forgiveness of $33,258 in loans he had made to the company. The number of authorized shares was increased and the founders were issued additional shares to retain the same ownership percentages. They were also issued additional shares for services rendered and cancellation of loans to RPost, Inc. That same month, RPost was reorganized as Bermuda corporation RPost International Limited (RIL). RIL's directors adopted written resolutions allocating shares in the new corporation. The founders exchanged their common shares of RPost for common shares of RIL.

On January 2, 2001, RIL's directors cancelled the allotment of shares made in September 2000. The directors clarified the founders' allotment of shares of RIL in exchange for their shares of RPost as follows: 4,822,000 to Tomkow, 3,616,500 to Khan, and 3,616,500 to Barton. On May 30, 2001, RIL's directors adopted a resolution issuing an additional 500,000 shares of common stock to each of the founders at a price of $0.01 per share. $5,000 was deducted from the expenses and deferred compensation owed to Barton. On August 21, 2001, RIL's directors adopted a resolution allotting additional

3

shares as follows, in exchange for valuable services rendered and cancellation of loans to the company: 2,500,000 shares to Tomkow in exchange for cancellation of a loan for $25,000, 1,900,000 shares to Khan for cancellation of a loan for $16,089, and 1,900,000 to Barton for cancellation of a loan of $8,089. Barton believes his allocation was later corrected to reflect a value of $0.001 per share and payment of $1,900. Barton, Khan and Tomkow each earned salaries of $8,000 per month, plus expenses of $2,000 per month. They received as much of their salaries as the company could afford to pay and deferred the rest. The cost of Barton's shares was charged against Barton's accrued salary and unpaid expenses.

Barton suffered a stroke in September 2003. In May or June 2004, Symantec Corporation invested $1.1 million for preferred shares of RIL. On September 20, 2004, Barton's attorney wrote Khan and Tomkow. He raised several concerns and confirmed Barton's resignation from the RPost entities effective immediately. He requested delivery of Barton's share certificates and equity documentation within three days. He wrote additional letters with similar requests.

In June 2005, Khan, Tomkow and RIL responded to Barton's lawyer that RIL had not issued any common stock certificates to founders and no provision of the by-laws required the company to deliver share certificates for founders' shares. Roston became a RIL director in 2005.

On July 7, 2005, Barton filed an action against RIL, Kahn, Tomkow, and another individual, for breach of fiduciary duty and violation of the Labor Code. (*Barton v. RPost International Limited et al.* (Super. Ct. L.A. County, 2005, No. YC051312).) Barton alleged defendants had refused to deliver his stock certificates, failed to provide accurate corporate financial reports, failed to set aside reserves for legal defense, failed to pay deferred salary, and failed to reimburse him for reasonable expenses.

On July 21, 2005, RPost and RIL filed an action against Barton for specific performance, breach of contract, and declaratory relief. (*RPost, Inc., et al. v. Barton* (Super. Ct. L.A. County, 2005, No. YC051416).) The complaint explained the allocation of Barton's shares and alleged Barton held 6,016,500 shares of common stock which

4

could not be transferred without notice to the company or without offering the company the opportunity to purchase the shares. At some point, the actions were consolidated.

RIL filed an answer to Barton's complaint. The individual defendants filed a demurrer. When Barton tried to file an amended complaint to address deficiencies raised in the demurrer, the court clerk refused to accept it, because RIL had filed an answer. The trial court sustained the demurrer without leave to amend and the action against the individual defendants was dismissed. Barton appealed.

At a meeting in January 2006, the RIL directors resolved to issue a call "to those shareholders that had not paid for their shares in accordance with Bye-law 10, that this call shall be for immediate payment and that notice of this call shall be delivered by Registered E-mail on January 31, 2005, and that all unpaid shares as of February 15, 2006 be liable to be forfeit in accordance with Bye-law 11." On January 31, 2006, RIL sent a lengthy e-mail to shareholders which included a notice that RIL was making a final call on all unpaid shares, payable by wire by February 15, 2006, or unpaid shares would be liable to be forfeited. Khan wrote three checks totaling $10,500 as additional consideration for his shares of common stock. Barton received the e-mail, but did not believe it applied to him, because he had paid for his shares.

Khan, Tomkow, and Roston attended a meeting of RIL directors on April 24, 2006. Khan recommended RIL revise the allocation of shares in the minutes from 2000 and 2001, but retain the original signatures, including Barton's signature. The RIL directors resolved to "correct" the mathematics of the share recapitalization adopted September 13, 2000, and strike clarifying resolutions from the minutes prepared January 2, 2001. This action deleted the third page of the January 2, 2001 minutes explaining the allocation of shares to the founders, but retained the signature page.

The directors also struck resolutions reflected in the minutes of February 1, 2001, and August 21, 2001, "that contain defects including errors and missing signatures." They added payment terms to the May 30, 2001 resolution. "It was RESOLVED that the Board of Directors accept the forfeiture and surrender of unpaid shares liable to be

forfeited. [¶] It was FURTHER RESOLVED that management would provide a proposal on how to dispose of the shares for review by the Board of Directors."

On June 8, 2006, Barton filed a new complaint against RIL seeking specific performance and damages for failure to issue stock certificates. (*Barton v. RPost International Limited* (Super. Ct. L.A. County, 2006, No. YC053346.) The complaint alleged Barton is the registered owner of more than 6,000,000 shares. He had been requesting RIL issue and deliver stock certificates representing his shares since September 2004, which RIL refused to do. He sought specific performance ordering RIL to deliver stock certificates accurately reflecting the number of RIL shares he owned. He also sought damages of $5 million for failure to deliver his stock certificates upon written demand.

On August 22, 2006, RIL dismissed its complaint against Barton without prejudice. A directors' meeting was held on October 23, 2006, attended by Khan, Tomkow, Roston and others. The minutes reflect RIL's management hired Bermuda counsel to respond to Barton's request for share certificates. The Bermuda firm provided an opinion on October 2, 2006, that Barton had no title to the shares at issue, because extrinsic evidence showed his allotment was conditioned on having a degree to practice law. The directors accepted the legal opinion.

On November 22, 2006, RIL filed an answer to Barton's second lawsuit alleging 25 affirmative defenses. The thirteenth affirmative defense alleged Barton was not and never had been a shareholder of RIL and therefore lacked standing to assert the causes of action. On January 30, 2007, RIL's attorney Robin Crowther sent a letter to Barton's counsel stating, "RPost International's position in this lawsuit that Barton owns no shares and is not entitled to assert any of the rights of RPost International shareholders."

On February 5, 2007, Barton sent an e-mail to Roston and another RIL director, attaching Crowther's letter. He stated, "they now take the position that I am not a shareholder of RPost and, further, that the board of directors has accepted that position. [¶] Please confirm whether a board meeting was called to 'decide' such an issue and what each of your votes and positions were/are in connection with this issue."

6

On February 7, 2007, Barton's attorney sent a letter to Crowther, quoting Crowther's statement and noting the affirmative defense in RIL's answer that Barton owns no shares. He requested supporting documents and accused RIL of attempting to steal Barton's shares.

In December 2007, this appellate court held the trial court should have accepted filing of Barton's amended complaint in his first action or granted him leave to amend. (*Barton v. Khan* (2007) 157 Cal.App.4th 1216, 1219-1221.) We reversed the judgment of dismissal as to the individual defendants and remanded the case with instructions to grant Barton leave to file an amended complaint. Barton filed an amended complaint too late, however, and the trial court struck the amended complaint.

Krechman replaced Roston on RIL's board of directors in early 2008. Barton took Khan's deposition on July 7, 2009. Khan stated that RIL cancelled Barton's shares and returned them to RIL's treasury. He could not remember the date the event occurred. Barton was very angry and livid when he learned his shares had been cancelled. Documents at trial showed RIL gave a report to auditor Kabani & Company showing 6,024,508 shares were forfeited after June 30, 2008, and before June 30, 2009. Defendants claimed to have destroyed RIL's shareholder registries. It was stressful for Barton to learn RIL directors forged minutes omitting his allotment of shares.

Barton's actions were consolidated. The cause was set for trial on January 25, 2010, but apparently continued and commenced in April 2010. On May 4, 2010, the trial court granted a motion for directed verdict under Code of Civil Procedure section 631.8 as to the cause of action for delivery of stock certificates. The court found none of the contingent events had occurred which would require RIL to deliver stock certificates to the founders. RIL's failure to deliver share documents to Barton was not wrongful. The court found Barton's testimony credible and denied the motion as to the cause of action for unpaid wages. The parties settled the consolidated action in 2012.

## The Instant Action

Barton filed the complaint in the instant case on January 29, 2010, prior to trial in his earlier lawsuits. He filed the operative third amended complaint on February 16, 2011, against several defendants, including Symantec Corporation, RIL, RPost, Khan, Tomkow, Krechman and Roston. The complaint alleged causes of action for conversion, breach of fiduciary duty, a derivative claim for breach of fiduciary duty, declaratory relief, fraud, and violation of Business and Professions Code section 17200.

Symantec settled Barton's derivative claim in the instant action. The trial court found the settlement was made in good faith. RIL sold its assets to RPost Communications Limited (RComm) in March 2011. Trial commenced in the instant action on March 1, 2012. The case was tried to the court over several days between March 1, 2012, and April 12, 2012. The parties presented documents supporting the facts above, as well as testimony from Barton, Khan, Tomkow, former RIL director Richard Pryor, individuals who had meetings with Barton early in the company's history, and financial experts. RComm employs approximately 21 people. Defendants' financial expert Kevin Henry concluded the value of Barton's common shares at the time of conversion was zero. Barton's financial expert Jaime d'Almeida concluded the value was $2.43 per share and the total value of Barton's shares at the time of conversion was $98,004,076.

The court issued a statement of decision on August 3, 2012, finding as follows. Barton's stock was converted on June 30, 2009, or July 7, 2009, when the shares were transferred back to the RIL treasury. The date of conversion is well within the three-year statute of limitations. Even if the statute of limitations began to run when Barton saw attorney Crowther's letter on February 7, 2007, the lawsuit was timely. Barton did not split his cause of action, because the earlier lawsuit involved a different issue concerning delivery of the stock certificates. Although Barton did not write a check in consideration for issuance of stock, none of the founders paid for their initial stock. Consideration for the shares was given in the form of unreimbursed expenses and compensation. After

8

Barton no longer worked at the company, Khan and Tomkow wrote checks to RIL to document the price paid in cash for their shares and straighten out RIL's financial record-keeping.

Defendants retroactively created and modified corporate resolutions to revise the company's history to support the result they sought. Particularly egregious was the resolution prepared as if executed on January 2, 2001, including Barton's signature. In fact, Barton had executed a corporate resolution confirming issuance of 3,616,500 shares of RIL to Barton and Khan. The court did not believe the shareholder registry, which was the best evidence of the issuance of RIL stock, had been misplaced or destroyed. The failure to produce the shareholder registry cast further doubt on testimony that Barton's shares were properly canceled and returned to the treasury in 2006.

The court issued a declaration that Barton was at all relevant times an owner of 6,016,500 common shares of RIL and provided appropriate consideration for the shares of stock in the form of unreimbursed expenses and salary owed. The court ordered Barton to submit a check to RIL's treasury in an amount equivalent to Khan's payment for the same number of shares to balance RIL's financial records. RIL was prohibited from taking any action to encumber, forfeit or cancel Barton's shares without prior written approval from the court, Barton or his counsel. In addition, Barton's shares were not subject to amended bylaws, agreements, or other restrictions to which he had not personally or through counsel provided written consent. The court declined to order additional relief sought in connection with the declaratory relief and unfair competition claims, including appointment of a receiver, because it would impose a substantial and unjustified burden on defendants.

The court found Khan was not credible. He was aware of the status of Barton's legal education at all times. Defendants' financial expert had disputed the "back solve" valuation method, but provided no alternative. The court concluded the value of Barton's shares was not zero, because defendants had committed 13 years to the company's success and Khan successfully raised substantial funds to further the company's long-term goals. The court was not persuaded, however, that d'Almeida's valuation method

9

was appropriate. "Although the court recognizes that the experts were retained for a particular purpose, their widely divergent opinions support the conclusion that ownership of shares in RPost remains a very speculative proposition, the value of which is almost impossible to determine." The court noted there is no liquidation event upcoming. The court expressed concern that if a monetary value was assigned to the shares, future events could result in an inequity for either side. Therefore, since the shares of stock exist, the court ordered the return of the converted property. RIL was ordered to restore 6,016,500 shares of RIL common stock to Barton. If defendants had made further transfers of their stock to other entities since Barton's resignation, the same process must take place for Barton's shares so they retain the same benefit and potential value.

The court noted that Khan had written checks to RIL for a total of $10,500 as additional consideration for his shares of common stock. Barton was ordered to pay RIL's treasury $10,500 or accept an offset to his monetary damages award to confirm his ownership of 6,016,500 shares. The court was satisfied that Barton and Khan provided consideration for the issuance of 6,016,500 shares of common stock through unreimbursed expenses and salary. To ensure RIL's books and records would withstand scrutiny, since evidence showed Khan and Tomkow wrote personal checks as further consideration for their common shares, Barton was ordered to write a personal check as additional consideration in exchange for clear title to his shares.

Barton was entitled to reasonable compensation for time and money spent to recover the converted property, as well as damages for emotional distress suffered as a result of RIL's conduct. The court found Barton was involved in the company from the beginning and expected to maintain his ownership. After returning to the company following his convalescence from a stroke, the situation deteriorated, ending in the other founding shareholders conspiring to deprive him of his common shares of stock. The court awarded $100,000 in damages for emotional distress.

The court found Barton had not met his burden of proof to impose liability on Krechman and Roston for participating in a conspiracy to convert his common shares of stock.

10

After the trial court issued its statement of decision, further trial proceedings were held on the issue of punitive damages. Evidence of defendants' finances was presented. In March 2011, RIL had $1.26 million in its bank account. As of June 30, 2012, RIL had assets of $328,000 and liabilities of $100,000. $850,000 had been transferred from RIL to other RPost entities to enable the other entities to take advantage of business opportunities. In the initial offering of preferred shares of RComm in 2011, the price was $5 per share. Later that year, the price was raised to $5.25 per share for preferred shares. In 2012, the price was raised to $5.75 per share. At RComm's October 2012 shareholder meeting, Khan advised shareholders $5 million had been raised. RComm intended to raise $18.2 million over two years to expand its business. RComm's revenues are not sufficient to meet its expenses, so it needs to raise funds from investors to continue to fund operations. RPost entities were pursuing several patent infringement actions against defendants including Amazon and Paypal.

Khan's net worth includes a home appraised for approximately $800,000, with net equity of $232,000. His personal bank account balance has a minimum of $68,000. He earns $132,000 per year, but his expenses are approximately the same amount. A promissory note exists from RIL to Khan in the amount of $225,893. He owns 6,000,000 common shares of RIL, 750,000 common shares of RComm, 250 common shares of RMail Limited, and 188,042 preferred shares of RComm. Khan obtained several shares through the cancellation of loans made to RIL. If Khan's preferred shares were valued at $5.75, the total value would be $1,081,241.50.

Tomkow owns a home valued at $800,000, with net equity of approximately $355,000. He also earns a salary of $132,000 per year. His expenses are slightly less than his net salary. He has a retirement account. As of January 1, 2011, RIL owed $208,884 on a promissory note to Tomkow. Tomkow owns 76,000 in preferred shares of RComm, as well as common shares of RIL, RMail Limited, and RComm. At $5.75 per share, the value of his preferred shares of RComm is $442,307.25.

11

Barton suggested an award of $2.8 million in punitive damages against Khan would be appropriate. He suggested an award of $2.2 million in punitive damages against Tomkow.

The court reconsidered the appropriate remedy in the case and appointed expert C. Paul Wazzan to determine the value of Barton's shares of RIL at the time of conversion. Wazzan used the same Black-Scholes method that d'Almeida had used, but relied on more conservative assumptions. Using this method, Wazzan determined the enterprise value was between $33.8 million and $37.3 million. His assumptions of a one year time to liquidity and 50 percent discount for lack of marketability yielded an enterprise value of $33.8 million. Wazzan used an enterprise value of $33.8 million to determine Barton's common stock was worth $0.64 per share.

On June 18, 2013, the court issued a ruling on punitive damages and revised the statement of decision. The court noted that the evidence presented in the second phase of trial showed the assets and character of RIL had changed dramatically. Restoring Barton's shares would not provide the remedy the court had intended. The court needed a meaningful compensatory damages calculation to determine an appropriate punitive damages award.

The court adopted Wazzan's testimony that the shares of common stock had a value of $0.64 per share as of June 30, 2009. Barton's 6,016,500 shares had a monetary value of $3,850,560. The court modified the original statement of decision and determined Barton was entitled to a monetary judgment for the value of his converted shares against Tomkow, Khan and RIL in the amount of $3,850,560, less $10,500, for a net award of $3,840,060. The court was satisfied Wazzan properly chose and applied the "back solve" method in his analysis and made reasonable assumptions to determine the value of RIL common shares. The court modified the statement of decision to reflect RIL no longer needed to restore shares to Barton.

The court found Khan's course of conduct rose to a significant level of reprehensibility. Although his purported net worth is modest, he draws a six figure salary and attributes no value to his RIL holdings. The court awarded Barton punitive damages

12

in the amount of $250,000 as against Khan. Tomkow's net worth is comparable to Khan, but his conduct was less egregious. Although complicit in the conversion of Barton's shares, he was focused on developing the business and deferred to Khan on financial matters. The court awarded punitive damages of $150,000 to Barton as against Tomkow.

On August 30, 2013, the court reduced the award of damages by the amount of the settlement paid by Symantec and awarded prejudgment interest of $880,021.91. The court entered judgment that day awarding the net sum of $2,840,060 in compensatory damages, $100,000 in emotional distress damages, and $880,021 in prejudgment interest, for a total of $3,820,081.91 as against RIL, Khan and Tomkow. In addition, Barton was awarded $250,000 in punitive damages against Khan and $150,000 against Tomkow. Barton recovered nothing from Krechman and Roston, but the court declined to award them their costs. RIL, Khan and Tomkow filed a timely notice of appeal. Barton also appealed.

## DISCUSSION

### Standard of Review

We review an appeal from a judgment following trial under the substantial evidence standard of review. (*Jameson v. Five Feet Restaurant, Inc.* (2003) 107 Cal.App.4th 138, 143.) "'When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record,* there is substantial evidence, contradicted or uncontradicted, which will support the determination . . . . [W]hen two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court." (*Ibid.*) As long as there is substantial evidence, the appellate court must affirm, even if the reviewing justices personally would have ruled differently if they had presided

over the proceedings below and even if other substantial evidence supports a different result.  (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 874.)

## Act of Conversion Triggering Statute of Limitations

Defendants contend their refusal to deliver stock certificates and denial of Barton's shareholder status in pleadings constituted conversion of Barton's shares, at which point the statute of limitations began to run.  This is incorrect.  Substantial evidence supports the trial court's finding that the shares were not converted until they were cancelled in 2009.

A cause of action for conversion requires "'"the plaintiff's ownership or right to possession of the property at the time of the conversion; the defendant's conversion by a wrongful act or disposition of property rights; and damages.  It is not necessary that there be a manual taking of the property; it is only necessary to show an assumption of control or ownership over the property, or that the alleged converter has applied the property to his own use. [Citations.]" [Citation.]'" (*Shopoff & Cavallo LLP v. Hyon* (2008) 167 Cal.App.4th 1489, 1507.)  "It is the uniform rule of law that shares of stock in a company are subject to an action in conversion.  [Citations.]" (*Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 122.)

"The essence of the tort of conversion is not the acquisition of property by the wrongdoer, but a wrongful deprivation of it to the owner.  The Restatement of the Law of Torts (Second) defines conversion as 'an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.'" (11 Fletcher Cyclopedia of the Law of Corporations (2014) §5114, p. 133, footnotes omitted.)

"To maintain an action of conversion, the plaintiff must have had title to, or a right in, the shares at the time of the conversion.  There can be no conversion where the plaintiff did not in fact lose any of its control over, or rights in, its shares." (*Id*. at pp. 135-136.)  "The plaintiff must show that the defendant wrongfully converted the shares

14

and that the defendant's acts or conduct were such as to deprive the owner of the shares, either permanently and absolutely, or partially or temporarily." (*Id*. at pp. 136-137.)

"In general, the conversion dates from the time when the shareholder, being entitled to the immediate possession of the shares or of the certificate, makes a demand for it that is refused." (*Id*. at p. 138.) "An election to recover the shares themselves may bar the right to sue for their value as for a conversion, but merely seeking return of the shares as alternative relief does not." (*Id*. at pp. 140-141.)

"If a corporation wrongfully refuses to issue a proper share certificate when it has the power and is under an obligation to issue it, the corporation may be compelled to do so by a suit in equity for specific performance of its express or implied contract, at least where there is no adequate remedy at law, such as an action at law to recover for the breach. A shareholder seeking such relief must have performed the obligations that entitle the shareholder to the certificate or make tender of readiness to make such performance as the decree may require." (11 Fletcher Cyclopedia of the Law of Corporations, *supra*, §5165, pp. 265-266, footnotes omitted.)

"The shareholder may, instead of suing to compel the issuance and delivery of a certificate, have an action against the corporation for the damages sustained by reason of the failure or refusal to issue a certificate. Thus, . . . if the shareholder has title to the shares, the failure or refusal to deliver a certificate may be treated as a conversion of the shares, and the shareholder may maintain an action to recover damages." (*Id*. at pp. 268-269.)

In this case, the trial court found defendants converted Barton's shares when they cancelled and returned them to the treasury on June 30, 2009, or July 7, 2009. Cancelling the shares clearly interfered with Barton's ownership rights and constituted conversion. The documents RIL provided its auditors showed this action was taken between June 30, 2008, and June 30, 2009. Barton learned of RIL's action on July 7, 2009, through Khan's deposition testimony. There is substantial evidence to support the trial court's finding that RPost converted Barton's shares by cancelling them as of June 30, 2009, and that

15

Barton first learned of the conversion on July 7, 2009. Barton filed his action well within the statute of limitations for conversion.

Defendant's contention that Barton's shares were converted when RIL refused to deliver share certificates is incorrect. Barton had to have the right to immediate possession of his share certificates in order to maintain a cause of action for conversion based on the failure to deliver certificates. The trial court in the prior case ruled that RIL was not required to issue certificates for Barton's shares. Barton did not have the right to possession of his share certificates. RIL's refusal to deliver share certificates was not wrongful, and therefore, it did not constitute conversion. If Barton had sued defendants for conversion based on their refusal to deliver share certificates, he would have lost.

Defendants contend their assertions that Barton was never a shareholder should have caused Barton to suspect he had a claim for conversion and started the statute of limitations. A simple claim of dominion or intention to interfere under a pretense of right, without more, does not constitute conversion. (*Kee v. Becker* (1942) 54 Cal.App.2d 466, 472.) Defendants statements did not affect Barton's dominion over his shares. The shareholder registry and RIL's accounting documents continued to reflect that Barton owned the shares allocated to him. Defendants' statements in legal proceedings were simply reflected numerous defenses that they asserted. If Barton had sued defendants for conversion based on their statements that he was never a shareholder, he would have lost. There is no evidence that defendants exercised dominion over Barton's stock until they cancelled the shares in 2009 and returned them to RIL's treasury. Barton was suspicious and accused RIL of attempting to steal his shares long before the act of conversion took place. He did not have a viable cause of action until RIL interfered with his dominion over the shares by cancelling them and transferring them back to the treasury.

Substantial evidence supports the trial court's finding that Barton's shares were converted when RPost cancelled and transferred them, which Barton learned about on July 7, 2009. RPost's contentions concerning the statute of limitations for breach of

fiduciary duty, fraud, declaratory relief, and unfair competition are based on the same arguments and fail for the same reasons.

## Claim Splitting

Defendants contend Barton improperly split his claims into successive lawsuits based on the same cause of action. We disagree.

"Under [the doctrine of res judicata], all claims based on the same cause of action must be decided in a single suit; if not brought initially, they may not be raised at a later date. '"Res judicata precludes piecemeal litigation by splitting a single cause of action or relitigation of the same cause of action on a different legal theory or for different relief."' [Citation.]" (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 897.)

"'[T]he "cause of action" is based upon the harm suffered, as opposed to the particular theory asserted by the litigant . . . . Even where there are multiple legal theories upon which recovery might be predicated, *one injury* gives rise to only one claim for relief.' [Citation.]" (*Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 860.)

When Barton filed his complaints in 2005 and 2006 seeking the delivery of share certificates, no conversion had taken place. The trial court in the earlier action ruled RIL was not required to issue share certificates and the parties settled the matter without any finding of liability. The failure to deliver share certificates was not wrongful. A cause of action for conversion based on the failure to issue share certificates would not have been successful. It was not until RIL cancelled Barton's shares and transferred them back to RIL's treasury that the conversion occurred. The evidence showed Barton discovered RIL's conversion of his shares in 2009. Barton did not have a claim for conversion when he filed his earlier actions and did not split his claim.

## Conversion

Defendants contend the trial court's finding of conversion is not supported by substantial evidence, because Barton did not pay for his shares. Defendants fail to demonstrate error.

The evidence showed Barton provided consideration for his allotments through unpaid expenses and salary owed to him. The resolutions state the allotments are made in exchange for shares of the previous company, cancellation of loans, and services rendered. Shares were allotted based on consideration received from Barton. The fact that the other founders paid additional sums several years later in an abundance of caution did not mean Barton did not provide consideration for his shares.

Since we conclude the trial court's finding of liability is supported by substantial evidence of conversion, we need not consider defendants' additional contentions that liability was not supported by substantial evidence of breach of fiduciary duty, fraud, or unfair competition under Business and Professions Code section 17200.

**Compensatory Damages**

Defendants contend the amount of compensatory damages is too speculative. We disagree.

"'"'Where the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty. [Citations.] The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation. [Citation.] This is especially true where . . . it is the wrongful acts of the defendant that have created the difficulty in proving the amount of loss of profits [citation] or where it is the wrongful acts of the defendant that have caused the other party to not realize a profit to which that party is entitled." ([Citation.])' [Citations.]" (*Asahi Kasei Pharma Corporation v. Actelion Ltd*. (2013) 222 Cal.App.4th 945, 972-973.)

"'The trier of fact may accept the evidence of any one expert or choose a figure between them based on all of the evidence.' [Citation.] There is insufficient evidence to

18

support a verdict 'only when "no reasonable interpretation of the record" supports the figure . . . .' [Citation.]" (*San Diego Metropolitan Transit Development Bd. v. Cushman* (1997) 53 Cal.App.4th 918, 931 (*San Diego Metropolitan Transit Development*).)

In *San Diego Metropolitan Transit Development*, *supra*, 53 Cal.App.4th 918, "the jury had to determine damages based on two diametrically opposed expert opinions that varied not only in amounts but also in methodologies and factors considered. (*Id.* at pp. 924-925.) The damages the jury awarded fell between the contrasting figures presented by the experts. (*Id.* at p. 931.) In such circumstances, it is well established that '"[t]he trier of fact may accept the evidence of any one expert or choose a figure between them based on all of the evidence."' (*Id.* at p. 931.)" (*Maughan v. Correia* (2012) 210 Cal.App.4th 507, 522-523.)

In this case, defendants' expert Henry concluded the value of Barton's common shares at the time of conversion was zero, while Barton's expert d'Almeida concluded the value was $2.43 per share for a total value of $98,004,076. Court-appointed expert Wazzan, like d'Almeida, determined the value of Barton's shares using a variation of the Black-Scholes option pricing model which the parties referred to as the "back solve" formula. Black-Scholes is a standard economic formula used in financial derivatives to price options. In order to use the back solve formula to determine the value of Barton's shares, Wazzan explained that the variable for the anticipated positive liquidity event must be carefully controlled to account for the nature of the company as a "start-up" and avoid overvaluing the enterprise. Wazzan made it clear that a later liquidity date led to an unreasonably inflated equity value. Wazzan's use of the "back solve" formula to estimate the value of Barton's common stock was reasonable and not speculative. Under this approach, he determined the enterprise value was between $33.8 million and $37.3 million. Assuming an enterprise value of $33.8 million, Barton's common stock was worth $0.64 per share. The trial court's finding that Barton's common stock had value of $0.64 per share as of June 30, 2009, was supported by substantial evidence and not too speculative.

RPost also contends Barton's shares should have valued based on a conversion date in late 2004, early 2005, or no later than October 2006. We disagree. As discussed above, substantial evidence supported the trial court's finding that the act of conversion took place in 2009. The court's calculation of the value of the converted property as of that date was correct.

Because we conclude the award of compensatory damages was fully supported by the evidence of conversion, we need not address defendants' contention that these damages could not be awarded as restitution under Business and Professions Code section 17200.

## Emotional Distress Damages

Defendants contends there is no substantial evidence Barton suffered emotional harm to support an award of noneconomic damages for emotional distress. We agree.

"'Damages for emotional distress have been permitted only where there is some means for assuring the validity of the claim. [Citation.] The case law reveals a diversity of circumstances in which recovery for emotional distress may be had. They are loosely linked in the sense that in each it could be said that a particular form of mental suffering naturally ensued from the acts constituting the invasion of another kind of protected interest. "The commonest example . . . is probably where the plaintiff suffers personal injuries in addition to mental distress as a result of negligent or intentional misconduct by the defendant." [Citation.] Pain and suffering is the natural concomitant of a personal injury. [Citation.] "[I]n the case of many torts, such as assault, battery, false imprisonment, and defamation, mental suffering will frequently constitute the principal element of damages." [Citations.] *Molien* [*v. Kaiser Foundation Hospitals* (1980)] 27 Cal.3d 916, found sufficient assurance of the validity of a claim of emotional distress in the nature of the cause of action for negligent misdiagnosis, predicated as it was upon a false imputation of syphilis, which by statute constitutes slander per se, an intentional tort. [Citation.] In torts involving extreme and outrageous intentional invasions of

20

mental and emotional tranquillity, the outrageous conduct affords the necessary assurance of the validity of the claim. [Citation.] Recovery also has been sanctioned for emotional distress which could be said naturally to ensue from an act which invaded an interest protected by an established tort. (See, *Sloane v. Southern Cal. Ry. Co.* [(1896)] 111 Cal. 668 [humiliation from wrongful ejection from train]; *State Rubbish etc. Assoc. v. Siliznoff* [(1952)] 38 Cal.2d 330 [intentional infliction of emotional distress]; *Crisci v. Security Ins. Co.* [(1967)] 66 Cal.2d 425 [physical injuries and psychosis resulting from fall through opening]; see also *Acadia, California, Ltd. v. Herbert* (1960) 54 Cal.2d 328, 337 [mental suffering occasioned by fear for safety of family caused by trespass]; *Kornoff v. Kingsburg Cotton Oil Co.* (1955) 45 Cal.2d 265, 271 [discomfort and annoyance caused by nuisance]; *Herzog v. Grosso* (1953) 41 Cal.2d 219, 225 [annoyance ensuing from trespass].)' [Citation.]" (*Gonzales v. Personal Storage, Inc.* (1997) 56 Cal.App.4th 464, 472.)

"[T]he limits imposed with respect to recovery for emotional distress caused by a defendant's negligence do not apply when distress is the result of a defendant's commission of the distinct torts of trespass, nuisance or conversion. Indeed, with respect to trespass, the law is clear that '. . . damages may be recovered for annoyance and distress, including mental anguish, proximately caused by a trespass.' (*Armitage v. Decker* (1990) 218 Cal.App.3d 887, 905.) Thus the plaintiffs in *Armitage v. Decker* were allowed to recover for distress they suffered 'as a result of having their property line buried under large amounts of dirt, making it appear that one side of their property abuts a quarry, after having spent a long time looking for the best piece of property they could afford. The evidence also supported a conclusion that the [plaintiffs] suffered distress due to the spillage of dirt onto their property and the threat of interference with drainage on their property, as well as concern over appellant's operation of the bulldozer on the berm.' (*Id.* at pp. 905-906.)" (*Gonzales v. Personal Storage, Inc.*, *supra*, 56 Cal.App.4th at pp. 474-475.)

"[I]n the context of a conversion claim there is far less likelihood that allowing recovery for emotional distress damages will create liability which is out of proportion to

21

the nature of the defendant's act. It follows that when a defendant is guilty of conversion, there is considerably less justification for imposing the limits on emotional distress damages which exist in negligence cases[.]" (*Gonzales v. Personal Storage, Inc.*, *supra*, 56 Cal.App.4th at p. 477.)

In this case, however, there is insufficient evidence Barton suffered emotional distress to support an award of damages. Barton testified that when he heard Khan's testimony at his deposition that the shares had been cancelled, he was very angry and livid. A year later, when he learned in court that his name had been forged on documents in order to unwind the transactions, it was very stressful. Standing alone, this evidence is insufficient to support an award of emotional distress damages. In most cases where there is only a financial loss, no emotional distress damages are recoverable. In respondent's brief on appeal, Barton claims additional evidence of emotional distress was presented to the court, but Barton fails to provide any citation to the record for additional evidence. Our own review of the record has not uncovered any additional evidence of emotional distress. The award of noneconomic damages was not supported by the slim testimony that Barton was livid about the cancellation of his shares and stressed by discovery during trial that minutes had been forged.

## Punitive Damages

Defendants contend the awards of punitive damages were excessive, because reprehensibility was minimal and the amount was disproportionate to their net worth.

"An award of punitive damages hinges on three factors: the reprehensibility of the defendant's conduct; the reasonableness of the relationship between the award and the plaintiff's harm; and, in view of the defendant's financial condition, the amount necessary to punish him or her and discourage future wrongful conduct. [Citations.]" (*Kelley v. Haag* (2006) 145 Cal.App.4th 910, 914.)

There is substantial evidence of the reprehensible nature of defendants' conduct. Barton had a serious health incident which forced him to work less. His co-founders

showed indifference to his health when they engaged in their scheme to force him out of the company and deny his stock ownership. They took repeated actions to achieve their goal, from fabricating minutes with his signature, claiming ownership of his shares was contingent on a law degree, destroying the company's shareholder registries, transferring assets to new companies and providing business opportunities to subsidiary companies that prevented Barton as a common shareholder of RIL from participating. Barton, having suffered a stroke, was financially vulnerable and testified that he worried about paying his rent. Barton's harm resulted from Kahn and Tomkow's malice and deceit, not mere accident.

There was also substantial evidence of Kahn and Tomkow's net worth to support the amount of the award. Defendants have not presented all of the evidence of their net worth in their statement of facts on appeal. The award of $250,000 in punitive damages against Khan is supported by evidence that his preferred shares of RComm have a value of $5.75 per share, with a total value of $1,081,241.50. The price of the preferred shares was their value as of the time of trial. The award of $150,000 in punitive damages against Tomkow is similarly supported by the value of the preferred shares he owns in RComm, which was shown to be $442,307.25. In addition, both defendants have net equity in their homes and bank accounts.

**Prejudgment Interest**

RPost contends Barton was not entitled to prejudgment interest, because Barton's shares were not marketable and he did not suffer any loss. This is correct.

Civil Code section 3336 provides: "The detriment caused by the wrongful conversion of personal property is presumed to be: [¶] First--The value of the property at the time of the conversion, with the interest from that time, or, an amount sufficient to indemnify the party injured for the loss which is the natural, reasonable and proximate result of the wrongful act complained of and which a proper degree of prudence on his

23

part would not have averted; and [¶] Second--A fair compensation for the time and money properly expended in pursuit of the property."

In a successful action for conversion, the plaintiff can recover the market value of the converted property, plus interest from the date of conversion. (*Crofoot Lumber, Inc. v. Ford* (1961) 191 Cal.App.2d 238, 249.)

In addition, Civil Code section 3288 provides the trial court discretion to award interest: "In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury."

We have already concluded the value of the converted property was not overly speculative. The award of prejudgment interest based on the value of the property properly compensated Barton for the loss of his shares. Defendants have failed to show any abuse of discretion by the trial court in awarding prejudgment interest under the applicable statutes.

## Barton's Appeal

In his appeal, Barton contends the undisputed evidence shows Roston and Krechman were equally liable for conversion. He has not set forth facts, however, demonstrating their liability. Barton's brief argues generalities, rather than providing citations to the record and authority to demonstrate that the trial court's rulings were wrong. (See *Villanueva v. City of Colton* (2008) 160 Cal.App.4th 1188, 1198.) "We are not required to search the record to ascertain whether it contains support for [plaintiff's] contentions." (*Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545.) The evidence at trial does not support finding liability as to Roston or Krechman. Roston was an RIL director until early 2008. There is no evidence Roston participated in the act of conversion in 2009. Krechman became a RIL director in 2008, but there was no evidence that she was aware of or participated in the act of conversion in 2009. The

24

conversion was shown from a document provided to auditors reflecting Barton's shares had been cancelled and Khan's deposition testimony that the act took place. There was no evidence that Krechman was aware of the action, let alone had any meaningful participation in that action. The trial court properly found Roston and Krechman were not liable under the evidence presented.

## DISPOSITION

The judgment is modified to reduce the amount of damages by deducting emotional distress damages of $100,000. As modified, the judgment is affirmed. The parties are to bear their own costs on appeal.


KRIEGLER, J.


We concur:



TURNER, P. J.



MOSK, J.

25