Filed 10/28/24  O'Toole v. Oceanview Cottages CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ROSEMARY O'TOOLE, et. al, | D080948 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2020-00016583-CU-CD-CTL) |
| OCEANVIEW COTTAGES, LLC, et. al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Diego County, Keri Katz, Judge.  Affirmed as modified.

Wood, Smith, Henning & Berman, Steven R. Disharoon and Robin L. Krutzsch for Defendants and Appellants.

Quade & Associates, Michael W. Quade and Cheryl L. Gustafson for Plaintiffs and Appellants.

INTRODUCTION

This is an appeal and cross-appeal from judgment rendered by a judicial referee on construction defect claims.  All issues presented involve damages.  We affirm with one modification.

BACKGROUND

The plaintiffs in the underlying action are Rosemary O'Toole (O'Toole) and 611 Stratford Court, LLC (Zable) (collectively, plaintiffs). They each own one of the two condominium units in a residential building at 611 and 613 Stratford Court, Del Mar.[1] The building was originally owned, built, and developed by Oceanview Cottages, LLC; Pacific Stratford Three, LLC; Pacifica Construction CA, Inc.; and Stratford Del Mar, Inc. (collectively, defendants).

In May 2020, plaintiffs filed suit against defendants asserting the condominium units were "not properly constructed to prevent water from entering though walls, roofs, decks, windows, and foundations, allowing water to enter the buildings[.]" In October 2020, the parties submitted the controversy to judicial reference by stipulation. Relevant here, the statement of claims submitted for adjudication included claims for (1) negligence, (2) violation of the building standards set forth in Civil Code section 896,[2] (3) negligent misrepresentation, (4) intentional misrepresentation, and (5) concealment.

On April 5, 2022, the referee rendered a final decision and award. The referee found defective construction in both units, specifically: "[T]he waterproofing system for the east wall was improperly assembled and constructed by [defendants]. In addition, [defendants] did not adequately provide for the substantial flow of groundwater from the adjacent uphill property, resulting in the unmanaged flow of water onto the [condominium

---

[1] Unit 611 was formerly owned by Walter Zable as trustee for the Ana Bianca Zable trust.

[2] Undesignated statutory references are to the Civil Code.

2

units].  The drainage system as built seems to be incapable of directing water away from the [units], allowing that water instead to challenge and breach the improperly constructed waterproofing system and associate building components.  Further, the drainage systems intended for landscaping, surface drainage, rainfall, and prevalent coastal moisture were inadequately constructed to effectively assist in the dewatering of the [units].  Additionally, the construction of the balcony deck improperly allowed water to enter the garage, and the windows in the below-ground elevations leak."

Based on these findings, the referee ruled in favor of plaintiffs on two causes of action:  violation of section 896 statutory building standards, and negligence.  The referee denied all of plaintiffs' remaining claims, including the claims for negligent misrepresentation, intentional misrepresentation, and concealment.  Defendants appealed and plaintiffs cross-appealed.  As noted, all issues raised involve the referee's award of damages.

## DISCUSSION

## I.

### *The Referee Did Not Improperly Exclude Defendants' Revised Cost of Repair Report*

Defendants ask us to remand for reconsideration of the referee's cost of repair award.  They contend the referee violated their right to due process by reversing an evidentiary ruling after the close of evidence without notice and an opportunity to be heard.  We reject this contention.  Defendants' claim does not take into account the distinction between a trial court's gatekeeping role with respect to evidentiary rulings and its final assessment of the evidence when it decides the case in a bench trial.  It is also based on a misreading of the referee's final decision.

3

During trial, the parties presented competing expert opinions about the scope of repairs needed to rectify the construction defects in the two condominium units. In addition, each party presented expert opinion and reports about the cost to implement the repairs recommended by their experts.

Defendants presented two cost of repair reports. The original cost of repair report (for $127,616.87) was based on the scope of repair advocated by their experts. The revised cost of repair report (for $459,691.23) included additional repairs the parties had discussed during a pretrial mediation.

Plaintiffs sought to exclude from evidence the revised cost of repair report on the ground that it was based on confidential mediation discussions. The referee overruled plaintiffs' objection and allowed the defendants' revised cost of repair report into evidence along with supporting testimony.

The referee agreed with defendants that the mediation privilege "certainly protects any admissions, concessions, agreements" that occur during mediation, but "people who are participating are not then expected to scrub their brains and scrub their memories of any ideas that may germinate there [at a mediation]." She agreed that to rule otherwise would "shut down any opportunity for the defense to do anything with their strategy that was in any way touched upon by any participant in any mediation previously held in the case."

After trial and the close of evidence, the referee awarded damages to plaintiffs based on the full amount of their cost of repair, finding their proposed scope of repair "provide[d] a greater likelihood of success in reconstructing the improvements." The referee's written decision explained she selected the scope of repair recommended by plaintiffs over the scope of repair recommended by defendants, because she found plaintiffs' experts

4

correctly identified a major cause of water intrusion to be a construction defect in a subterranean wall:

> "Construction and geotechnical professionals opine for the [plaintiffs], and the undersigned finds it to be most likely, that the waterproofing on the east-facing subterranean exterior wall was improperly installed, causing water to enter the building continuously since the first rains occurred during construction. The most significant portion of [plaintiffs'] proposed repair includes exposing, cleaning, and waterproofing the east wall across the back of both units, a job, done properly and thoroughly, requiring extensive earthwork and precautionary measures due to the limited space between that wall and the retaining wall on the uphill property behind it. [Defendants] present a less expansive, less expensive repair scope, generally approaching the work from the interior."

Defendants claim they were denied due process because the referee purportedly refused to consider their revised cost of repair report "after initially ruling that [it] was admissible" without providing "meaningful notice" that she was "contemplating changing her order." Defendants claim they "introduced two cost of repair estimates, one of which was a compromise between the two parties' positions. . . . Each was allowed as evidence by the [r]eferee. However, the [r]eferee reversed that ruling in her [d]ecision, remarking that she could not consider the [r]evised [c]ost of [r]epair due to mediation privileges and lack of foundation."

We do not agree with defendants' interpretation of the referee's written decision. The referee did not *exclude* the defendants' revised cost of repair estimate from evidence because of the mediation privilege or lack of foundation. Nowhere does her decision say this. According to the decision, the referee appropriately assessed the revised cost of repair report as part of the decision-making process, but she ultimately found the record lacked sufficient evidence to consider the associated scope of repairs to be the best

5

choice to make plaintiffs whole.  The referee's decision explains the scope of repair associated with the revised cost of repair estimate was devised as a potential compromise between the parties' positions at mediation, and defendants failed to present expert testimony at trial to explain why it would be the best plan to fix the construction defects as opposed to simply a legal compromise:

> "It should be noted here that [defendants] introduced a compromise cost of repair, the scope for which was not presented through qualified expert testimony.  (Ex[hibit] 386.)  It is left to the trier of fact to infer what scope is intended and which defect(s) it is intended to address.  Admittedly, this third cost of repair is written such that the informed reader might discern the intended scope and the defects to be addressed by it.  However, this third alternate scope had its inception in mediation and was not otherwise developed outside of that process.  *Absent the testimony of a qualified witness to support the scope*, and, critically, to allow that witness to be challenged on cross-examination, *there is insufficient evidence to consider this alternative as the basis for an award*."  (Italics added.)

The referee's ruling was consistent with standard procedure for admitting and assessing expert opinion testimony.  (Evid. Code, §§ 402, 801–802.)  During trial, "under Evidence Code sections 801, subdivision (b), and 802, the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771–772 (*Sargon*).)  In exercising its gatekeeper function, the court conducts a limited inquiry.  At this juncture, the court does not weigh an opinion's probative value or substitute its own opinion for the expert's opinion.  The court simply determines whether the opinion is worthy of consideration by the trier of fact.  (*Id.* at pp. 769, 772.)

6

After the close of evidence, the trier of fact—most often a jury but here the referee—is not bound by the earlier assessment. The preliminary determination that an expert opinion is admissible is not binding in the sense that it is "not a decision on its persuasiveness." (*Sargon, supra*, 55 Cal.4th at p. 772.) How much weight to give an opinion after the close of evidence is up to the trier of fact who may reject it entirely "if in [its] judgment the reasons given for it were unsound." (*Kastner v. Los Angeles Metropolitan Transit Authority* (1965) 63 Cal.2d 52, 58.) Explained another way, the referee's preliminary ruling there was sufficient foundation for admissibility was not binding on her subsequent assessment of its weight after all the evidence was in. Ultimately, "expert opinions . . . are worth no more than the reasons and factual data upon which they are based." (*Griffith v. County of Los Angeles* (1968) 267 Cal.App.2d 837, 847.)

We see no basis in the referee's written decision to conclude she reversed her earlier evidentiary ruling. To the contrary, the decision explains how she weighed the evidence. "When the record clearly demonstrates what the trial court did, we will not presume it did something different." (*Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 39 Cal.App.4th 1379, 1384.) The referee was entitled to reject defendants' revised cost of repair estimate on the ground that it lacked foundation to the extent defendants failed to link the revised estimate to expert testimony explaining why the underlying scope of repair was the best choice to repair the condominium units. We affirm this aspect of the referee's ruling.

## II.

### *Plaintiffs Are Not Entitled to Remand for a Punitive Damages Phase*

Plaintiffs sought punitive damages based on their fraud-based causes of action for negligent misrepresentation, intentional misrepresentation, and

7

concealment. To obtain punitive damages, plaintiffs were required to prove the elements of their fraud-based claims by clear and convincing evidence. (§ 3294.) In her written decision, the referee discussed whether plaintiffs sustained their burden to prove potential entitlement to punitive damages and found they did not. Plaintiffs contend "[s]ubstantial evidence of fraud by clear and convincing evidence requires a remand to the trier of fact . . . for a hearing on punitive damages."

We begin with the standard of review. It is *not* for substantial evidence. "In a case where the trier of fact has determined that the party with the burden of proof did not carry its burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. Instead, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence *compels a finding in favor of the appellant as a matter of law.* Specifically, we ask whether the appellant's evidence was (1) uncontradicted and unimpeached and (2) of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." (*Ajaxo, Inc. v. E\*Trade Financial Corp.* (2020) 48 Cal.App.5th 129, 163–164 (*Ajaxo*), italics added [cleaned up].) This is "an onerous standard." (*Id.* at p. 164.) It is one that is "almost impossible" for a losing plaintiff to meet, because unless the trier of fact made "specific findings of fact in favor of the losing plaintiff," we presume the trier of fact concluded that "plaintiff's evidence lacks sufficient weight and credibility to carry the burden of proof." (*Bookout v. State of California ex rel. Dept. of Transportation* (2010) 186 Cal.App.4th 1478, 1486 (*Bookout*).)

We turn next to the underlying burden of proof that was required to obtain punitive damages. To sustain an award of punitive damages, the

8

plaintiff must prove "by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." (§ 3294; *American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton* (2002) 96 Cal.App.4th 1017, 1049.) The clear and convincing standard " 'requires a finding of high probability.' " (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 998.) To prevail, "the evidence must be so clear as to leave no substantial doubt and sufficiently strong to command the unhesitating assent of every reasonable mind." (*Butte Fire Cases* (2018) 24 Cal.App.5th 1150, 1158 [cleaned up].)

Putting these standards together, plaintiffs face "an extremely high burden on appeal." (*Estes v. Eaton Corporation* (2020) 51 Cal.App.5th 636, 651.) Unsurprisingly, they have failed to demonstrate the evidence compelled a ruling in their favor as a matter of law by clear and convincing evidence on all elements of a fraud-based cause of action—a very tall order indeed.

"California law generally recognizes four forms of deceit: intentional misrepresentation, negligent misrepresentation, concealment, and failure to perform a promise." (*Finch Aerospace Corp. v. City of San Diego* (2017) 8 Cal.App.5th 1248, 1252.) "The well-established common law elements of [intentional] fraud which give rise to the tort action for deceit are: (1) misrepresentation of a material fact (consisting of false representation, concealment or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to deceive and induce reliance; (4) justifiable reliance on the misrepresentation; and (5) resulting damage." (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 481.) "Negligent misrepresentation is a separate and distinct tort, a species of the tort of deceit." (*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 407.) "The tort of negligent misrepresentation . . . does not require intent to defraud but only

9

the assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true." (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1255, citation omitted.)

Plaintiffs contend defendants committed fraud in five ways. They claim defendants (1) failed to disclose the expiration of the contractor's general contractor's license and consequent decision to obtain building permits as an "Owner/Builder," (2) failed to disclose they did not conduct an inspection recommended by a geotechnical engineer, (3) misrepresented the "R value" of the fiberglass insulation in the units, (4) failed to disclose modifications to the planned drainage design for the property, and (5) failed to disclose water intrusion events that took place during construction.[3]

Starting with the first four contentions, the referee found plaintiffs failed to demonstrate materiality for each of them. These first four contentions include allegations that defendants failed to disclose information as well as allegations they made affirmative misrepresentations. In the context of a real estate transaction, "undisclosed facts are material if they would have a significant and measurable effect on market value." (*RSB Vineyards, LLC v. Orsi* (2017) 15 Cal.App.5th 1089, 1097 [cleaned up].) To find fraud based on affirmative misrepresentations, a statement of fact is material if a reasonable person "would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 977.)

---

[3] Plaintiffs also assert defendants showed a "[g]eneral [l]ack of [c]are" on the job site, but they do not assert this as a separate ground for fraud. (Boldface omitted.)

10

To persuade us the evidence of materiality was so exceptionally strong the referee erred as a matter of law on this element, plaintiffs point to statements about the four contentions in declarations by O'Toole (owner of the 613 unit), Gregory Kunz (original owner of the 613 unit), Walter Zable (trustee for the original purchaser of the 611 unit), and Walter's wife, Stefanie Zable.

The witnesses state in their declarations that (1) defendants did not "apprise[ ]" them "of the expiration of the general contractor's license by the entity that pulled the permits" nor that "the developer of [611 and 613] Stratford Court proceeded as an 'Owner/Builder' " at some point during construction; (2) the insulation in the basement area was different than as represented in the purchase and sale documents; and (3) the drainage system on the eastern side of the property was modified from the original building plans. The declarations then state in conclusory fashion: "The above-stated facts significantly affected and currently affect the value or desirability of the property. I would not have proceeded forward with the purchase transaction had I known the facts stated in the preceding paragraph or I would have asked for a significant discount from the purchase price." That's it. Plaintiffs point to nothing more in the record on the element of materiality to support the first four contentions.

This is insufficient to require reversal and remand for a punitive damages hearing. The referee was not compelled to find that defendants' alleged misstatements and concealment of facts were material just because plaintiffs said they were material. The referee heard testimony by O'Toole and the Zables that repeated the statements in their respective declarations. She was entitled to disbelieve the witnesses based on their demeanor. She was entitled to disbelieve them based on inferences drawn from other

11

testimony in the record.  She was entitled to find the evidence lacked weight and persuasive value based on the witnesses' failure to elaborate as to the particular reasons why they would not have purchased the properties or asked for a discount had they known about the information that was misrepresented or not disclosed to them.  She was entitled to reject the testimony for a myriad of other reasons not apparent to us on a cold record.  A reviewing court starts with the presumption the record contains evidence to sustain every finding of fact that is needed to support the judgment.  (*Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 152.)  Plaintiffs have not demonstrated the evidence of materiality was "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."  (*Ajaxo, supra,* 48 Cal.App.5th at pp. 163–164 [cleaned up].)

Turning to plaintiffs' remaining contention—that defendants failed to disclose water intrusion events that took place during construction—the referee did find this information to be a "relevant material fact."  However, to be liable for fraud based on a failure to disclose, a defendant must have knowledge of the facts he or she is required to disclose.  (*Curran v. Heslop* (1953) 115 Cal.App.2d 476.)  The referee found defendants lacked the scienter that is required to prove fraud with respect to this remaining theory:

> "[T]he only relevant material fact here is that a construction defect caused the water intrusion events during construction.  A misrepresentation, if any there be, would be a failure to disclose that fact.  That misrepresentation requires that the speaker knew of the construction defect at the time.  The evidence falls short of the clear and convincing standard on this point.  While hindsight has afforded clarity about what problems have caused the conditions plaguing the Subject Property, it is not at all clear that the [defendants] knew about the

12

construction deficiencies and intentionally—or even negligently—withheld that information."

On this record, we cannot find the referee erred as a matter of law when she found insufficient evidence of scienter. At trial, to support their contention that defendants must have known the water intrusion was caused by a construction defect, plaintiffs pointed to pictures showing standing water in the basement after the roof was complete and the building was "dried in," as well as eyewitness testimony about the flooding by a civil engineer. The civil engineer testified the amount of water was "memorable" and he had not ever seen so much water in a basement "with the framing up like this."

In direct contrast, however, defendants' senior project manager testified he believed the water intrusion was caused by rain and that it is not "unusual for rainwater to enter a property during construction." Defendants further presented testimony by a geotechnics engineer that supported the manager's belief as a reasonable one. The engineer opined the water intrusion during construction was "just simple storm water that . . . could easily infiltrate the construction of the building. The openings were there for that to happen."

The evidence was thus in direct conflict at trial as to whether defendants knew the rain intrusion events during construction were caused by a construction defect, as opposed to water entering the property because construction had not yet been completed. Plaintiffs, accordingly, have failed to demonstrate the evidence of scienter was "uncontradicted and unimpeached." (*Ajaxo, supra,* 48 Cal.App.5th at p. 163 [cleaned up].)

Finally, plaintiffs assert there is an inconsistency between the referee's finding of liability for violation of section 896 building standards and her failure to find defendants were aware of the construction defects during construction when the basement flooded. We see no conflict, much less one

13

that requires judgment in favor of plaintiffs on a fraud cause of action as a matter of law.

In the portion of the decision that discusses liability, the referee relied on contemporaneous photographs to find water had intruded into the structure during construction through an "improperly applied waterproofing system" located at the east wall. She found the photographs to be in direct conflict with the project manager's recollection that water could have entered because the building, and the roof in particular, was incomplete:

> "The photographs reveal the stage of construction with at least two of [the water intrusion] events to be much further along than [the project manager's] recollection. . . . The photographs also reveal standing water along the back wall of the ground floor, but less so (or none at all) in the center of unit 613, where the 'low spot' was later discovered to be. Where contemporaneous photographs and human observations and recollections are so disparate, the photographs must prevail. While there was some legitimate dispute about whether the building was entirely 'dried in,' at least regarding the back wall, the undersigned finds that the waterproofing system had in fact been completed. The roof as depicted in the photographs appears to have been sufficient to protect the interior from rain. It could not do so during these (at least) three rain events because the water appears to have entered the structure through the east wall. In short, breaches in the improperly applied waterproofing system had already begun to occur."

This is not the kind of "specific findings of fact in favor of the losing plaintiff" that compels reversal as a matter of law. (*Bookout*, *supra*, 186 Cal.App.4th at p. 1486.) The conflict between the photographs and the project manager's memory does not prove he lied nor that he necessarily knew the building was defective. The project manager could simply have been wrong about the cause of the water intrusion events during construction.

14

We affirm the judgment denying liability on plaintiffs' fraud-based causes of action.

## III.

### *The Referee Erred by Awarding Lost Rental Income to Plaintiffs*

A.    *Additional Background*

The referee awarded damages for lost rental income to O'Toole in the amount of $204,750 and to Zable in the amount of $200,000. She based this component of the damages award on "the common law claim of negligence." Defendants contend this was error, because the Right to Repair Act of 2003 (the Act) (§ 895 et seq.) was the exclusive avenue for recovering economic losses due to construction defects in residential buildings under the circumstances presented here. We agree. We further hold the Act prohibits awards for lost income where a home business was not in compliance with local licensing laws. Our review is de novo. (*Bermudez v. Ciolek* (2015) 237 Cal.App.4th 1311, 1324.)

B.    *Legislative History and Governing Law*

In *Aas v. Superior Court* (2000) 24 Cal.4th 627, the California Supreme Court "held that the economic loss rule [barred] homeowners suing in negligence for construction defects from recovering damages where there is no showing of actual property damage or personal injury." (*McMillin Albany LLC v. Superior Court* (2018) 4 Cal.5th 241, 246 (*McMillin*).) In response to this ruling, homeowner and construction interest groups lobbied the Legislature for reform, and "[t]he major stakeholders on all sides of construction defect litigation participated in developing the Act." (*Id.* at pp. 246, 251.) "Informed by the various stakeholders' concerns, the Legislature enacted provisions that reflect a conscious effort to address how

15

and when various categories of damages would be recoverable going forward." (*Id.* at p. 251.)

The resulting statutory scheme "comprehensively revises the law applicable to construction defect litigation for individual residential units . . . first sold after January 1, 2003." (*Lantzy v. Centex Homes* (2003) 31 Cal.4th 363, 382, fn. 16.) It "sets forth detailed statewide standards" that govern residential construction defect litigation. (*McMillin, supra,* 4 Cal.5th at pp. 246–247.) Within this field, the Act supplants common law actions for recovery of economic loss as well as property damage including claims sounding in negligence. As a result, the Act is "the virtually exclusive remedy not just for economic loss but also for property damage arising from construction defects." (*Id.* at p. 247.) The Act specifically provides: "In any action seeking recovery of damages arising out of, or related to deficiencies in, the residential construction, design, specifications, surveying, planning, supervision, testing, or observation of construction, a builder . . . shall, except as specifically set forth in this title, be liable for, and the claimant's claims or causes of action shall be limited to violation of, the following standards, except as specifically set forth in this title." (§ 896.)

Section 944 lists the types of economic loss that may be recovered in an action under the Act. The list includes "the reasonable value of repairing any violation of the standards set forth in this title, the reasonable cost of repairing any damages caused by the repair efforts, . . . the reasonable cost of removing and replacing any improper repair by the builder, reasonable relocation and storage expenses, *lost business income if the home was used as a principal place of a business licensed to be operated from the home*, [and] reasonable investigative costs for each established violation." (§ 944, italics added.) With respect to these listed damages, the Act provides it is the

16

exclusive means of recovery absent an express statutory exception: "Except as provided in this title, no other cause of action for a claim covered by this title or for damages recoverable under Section 944 is allowed." (§ 943, subd. (a).) As explained by our high court, "section 944 identifies what damages *may* be recovered in an action under the Act, and section 943 establishes that such damages *may only* be recovered in an action under the Act, absent an express exception." (*McMillin, supra,* 4 Cal.5th at p. 251.)

Plaintiffs and the referee misread *McMillin* on this point. According to plaintiffs, "There is no express denial of [a] right to claim damages under negligence in *McMillin*." They further contend that, to the extent "lost rent is not recoverable under the [Act], then such damages are outside its scope and recovery is permitted under negligence. . . . According to the referee, *McMillin's* interpretation of the Act allows the recovery of damages for economic loss "under common law theories of negligence where actual damages are incurred."

*McMillin's* holding is precisely to the contrary: "[T]he text and legislative history [of the Act] reflect a clear and unequivocal intent to supplant common law negligence and strict product liability actions with a statutory claim under the Act." (*McMillin, supra,* 4 Cal.5th at p. 249.) "The Act, in effect, provides that construction defect claims not involving personal injury will be treated the same procedurally going forward whether or not the underlying defects gave rise to any property damage." (*Id.* at p. 253.) As explained by Justice Liu, the language in the Act "suggests an intent to create not merely *a* remedy for construction defects but *the* remedy." (*Id.* at p. 250.)

17

C.      *Plaintiffs Are Not Entitled to Lost Rental Income*

As noted, the referee awarded lost rental income to plaintiffs as a remedy for their common law claim of negligence. This was error. Plaintiffs' claims for lost rental income were based on construction defects in residential properties that were sold after 2003. These types of claims are covered by the Act. (§ 938.) As a consequence, absent an express exception in the statutory scheme, economic loss and property damage could only be recovered in an action under the Act; common law claims in negligence for these types of damages have been supplanted. (*McMillin, supra,* 4 Cal.5th at p. 251.)

Plaintiffs contend in the alternative they were entitled to recover lost rental income on their breach of contract and fraud-based causes of action. "Although the Right to Repair Act is the exclusive vehicle for asserting certain claims, it is not the exclusive vehicle for asserting *all* claims." (*River's Side at Washington Square Homeowners Association v. Superior Court* (2023) 88 Cal.App.5th 1209, 1237.) It is true the Act excludes from its provisions "any action by a claimant to enforce a contract or express contractual provision, or any action for fraud, personal injury, or violation of a statute." (§ 943.) The *McMillin* decision specifically acknowledges this carve-out: "[T]he statute here leaves the common law undisturbed in some areas, expressly preserving actions for breach of contract, fraud, and personal injury." (*McMillin, supra,* 4 Cal.5th at p. 249.)

But plaintiffs here *did not prevail* on any of their other causes of action. The referee expressly ruled: "All other theories of recovery are denied." Obviously, plaintiffs are not entitled to damages on causes of action where they were the losing parties.

We also reject plaintiffs' contention that we should overturn the referee's denial of their fraud claims on the ground that "the totality of the

18

evidence warrants a finding by a preponderance as to fraud." Again, we will not overturn a lower court ruling that there was a failure of proof at trial unless "the evidence compels a finding in favor of the appellant as a matter of law." (*Ajaxo, supra,* 48 Cal.App.5th at pp. 163–164.) As explained, plaintiffs' evidence of fraud was neither "uncontradicted and unimpeached" nor "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." (*Ibid.* [cleaned up].) Consequently, it does not matter whether the evidence is assessed under the preponderance of the evidence or clear and convincing evidence standard. The evidence was insufficient either way to require reversal as a matter of law.

Plaintiffs next contend the award should be upheld on the alternate ground that recovery of lost rental income is permitted under the Act. When a trial court judge gives an incorrect legal reason for a decision, we look for any other correct legal basis on which to sustain the ruling. (*Kemp Bros. Construction v. Titan Electric Corp.* (2007) 146 Cal.App.4th 1474, 1477.)

As noted, the Act allows homeowners to recover damages for "lost business income if the home was used as a principal place of a business licensed to be operated from the home." (§ 944.) Plaintiffs contend the language of section 944 must be read to include lost rental income because "the legislature would not have intended to leave a gaping hole with regard to damages for homeowners who rent out their valuable property and garner income from same." They assert, in effect, that rental income is a type of business income, and that the rental of residential property is one way to use a home as a principal place of business.

We question whether the Legislature intended to use the phrase "principal place of business" in such a roundabout way to authorize the recovery of lost rental income. It is especially questionable whether lost

19

business income, within the meaning of the Act, includes lost rental income when an entire home is rented out and there are no business operations by the owner on the premises at all (as was the case for the condominium unit belonging to Zable).

In any event, we leave this question for another day. The Act unequivocally prohibits the recovery of business income for businesses that are not in compliance with local licensing laws: "If a claim for damages is made under this title, the homeowner is *only* entitled to damages for . . . lost business income if the home was used as a principal place of a business *licensed* to be operated from the home." (§ 944, italics added.) The City of Del Mar requires a "business license" to rent out residential property. (Del Mar Mun. Code, §§ 5.04.010, 5.04.020, 5.08.010, 5.20.010.) Plaintiffs concede they did not have a Del Mar business license to rent out their respective condominium units.

Despite admitting they failed to obtain a required business license, plaintiffs contend they were nevertheless entitled to recover lost rental income because the particular business license required by Del Mar was enacted to raise tax revenue and is not a regulatory license. The Del Mar Municipal Code provides: "This Title is enacted solely to raise revenue for municipal purposes and is not intended for regulation." (Del Mar Mun. Code, § 5.04.010.) According to plaintiffs, the award of lost rental income was proper because the Del Mar licensing provision "has no function to regulate the conduct or activity it governs; its purpose is to raise funds."

We see this to be a distinction without a difference. We are not persuaded the Legislature intended, with the language used in section 944, to prohibit lost business income awards to businesses that illegally fail to obtain a required regulatory business license, but to allow such awards to

20

businesses that illegally fail to obtain a required business tax license and pay required taxes.

Nor do we agree with plaintiffs that the Del Mar Municipal Code "does not regulate whether a business can legally be operated." The code clearly makes it illegal to operate a business without a license under circumstances where one is required. Section 5.32.010, entitled "**License Required, Penalty**, provides, "Any person who transacts or carries on any commercial activity within the City without first having procured a license from the City in accordance with this Title to include paying the license tax thereon . . . shall be deemed guilty of an infraction." (Del Mar Mun. Code, § 5.32.010; see also *id.,* § 5.32.060 ["It is unlawful for any person to conduct a commercial activity under any license which has been suspended or revoked."].) The Del Mar business licensing provisions are thus not "regulatory" in the sense that they do not regulate businesses by telling them *how* they must operate. But the Del Mar Municipal Code makes it clear that it is illegal to operate a business without a license under circumstances, such as the rental of residential property here, where one is required. (Del Mar Mun. Code, §§ 5.04.010, 5.04.020, 5.08.010, 5.20.010.)

Plaintiffs had the burden of proof to demonstrate their homes were "used as a principal place of a business *licensed* to be operated from the home." (Civ. Code, § 944, italics added; Evid. Code, §§ 115, 500.) We hold they were not entitled to lost rental income under the Act.

Finally, in addition to damages for lost business income, the Act allows recovery of "relocation and storage expenses." (§ 944.) Plaintiffs contend they are entitled to lost rental income under this category of damages because there is purportedly "no material difference or legally significant difference between the legislature allowing relocation damages and the lost

rental amounts sought here." Plaintiffs cite no legal authority for this assertion, and we find it to be meritless.

"When the trial court makes a clear, uncontroverted and prejudicial error of law in the calculation of damages, the appellate court has the power to modify the judgment to correct that error." (*Maughan v. Correia* (2012) 210 Cal.App.4th 507, 523, citing Code Civ. Proc., § 43.) We modify the judgment by reducing the damages awarded to Zable by $200,000 and the damages awarded to O'Toole by $204,750.[4]

## DISPOSITION

The judgment of May 24, 2022, is modified to reduce the monetary award to O'Toole from $1,483,007.21 to $1,278,257.21, and the damages awarded to Zable from $1,245,299.20 to $1,045,299.20. As modified, the judgment is affirmed. Defendants are awarded costs on appeal.

DO, J.

WE CONCUR:

O'ROURKE, Acting P. J.

RUBIN, J.

---

[4] Because we have determined the referee erred when she awarded lost rental income damages, we do not reach O'Toole's contention that the award was too low.